Argued and submitted September 4, 1981, reargued April 6, judgment of Court of
Appeals reversed, district court affirmed May 4, petition for rehearing allowed;
decision withdrawn; Court of Appeals affirmed; remanded to District Court June
22, 1982 (293 Or 236, 646 P2d 1341), U.S. certiorari allowed, remanded to Oregon
Supreme Court July 5, 1984 (82 L Ed2d 873)
(See later issue Oregon Reports)

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## GARY PATRICK ROBERTI,
*Respondent on Review.*

(TC T79-12-0348, CA 18838, SC 27840)

644 P2d 1104

Virginia L. Linder, Assistant Attorney General, Salem, argued and reargued the cause for petitioner on review. With her on the petition were David B. Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem. With her on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Sid Brockley, Oregon City, argued and reargued the cause and filed the brief for respondent on review.

TANZER, J.

Roberts, J., filed a concurring opinion.

Lent, J., filed a dissenting opinion in which Peterson, J., joined.

Linde, J., filed a dissenting opinion.

## TANZER, J.

Defendant appeals his conviction of the crime of driving under the influence of intoxicants. He assigns as error the admission into evidence, over objection, of a statement he made in response to police questioning after the officer had pulled over his car. The case was tried to the court and the judge relied upon defendant's statements in coming to its finding of guilt. The Court of Appeals reversed, holding that the statement made after the officer had formed, but not communicated, his intention to arrest defendant was the product of custodial interrogation and should have been suppressed. We reverse and uphold the trial court.

### THE FACTS

Defendant was driving his car at 2:10 a.m. on a major highway in a rural area. The officer paced defendant's car at about 80 miles per hour and observed it weaving in the right hand lane, crossing over the fogline several times, and traveling at times close to the guardrail. The officer turned on the overhead lights on his police patrol car, and defendant brought his car to a stop at the side of the road, apparently in response to the officer's signal given by the overhead lights.

Defendant stepped out of his car and began to walk toward the rear of the car, where he was met by the officer. The officer detected an odor of alcoholic beverage on defendant's breath. He also noticed that defendant's eyes were watery and bloodshot and his face was flushed.

The officer told defendant of the officer's observations concerning defendant's operation of the vehicle. Defendant answered that he knew he had been going too fast, that he had had a "fight" with his wife, a passenger in the vehicle, and that he had had three drinks over the course of the preceding six hours, the last two after 11:00 p.m. Defendant swayed back and forth while talking to the officer.

Before administering the field sobriety tests, the officer asked defendant how much education he had, and defendant replied, "You name it, I've got it." The officer then asked defendant to say the alphabet, and defendant

did so very well. Defendant was unable, however, correctly to count backward from 100 to 85. Next, the "heel-to-toe" test was conducted on an asphalt-paved portion of the roadway with a slight uphill grade, the area being illuminated by the police car's "rear lights" and the officer's flashlight. Defendant did not maintain his balance well and staggered several times. When asked to stand on one leg, defendant lost his balance immediately, and on a second try maintained balance for about four seconds. Defendant did well on the "finger-to-nose" test, but when asked to say the months of the year, he so slurred his words as to be barely understandable.

At that point the officer had determined that he was going to arrest defendant for driving while under the influence of intoxicants. He did not communicate that determination to defendant or utter any words of arrest to defendant. Rather, the officer then asked defendant to rate himself on a scale of intoxication of zero to ten, zero "being like he hadn't had anything to drink" and ten being falling-down drunk. Defendant responded that he was a "low five" and that he should not have been driving and should have let another passenger drive. It is this statement which is in issue.

The officer "then placed the defendant under arrest for DUII and read the defendant his rights at 2:20 A.M."

## THE TRIAL

Upon trial the defendant was successful in excluding from evidence a tape recording made by the officer on the scene after defendant stopped his car. Moreover, test results of a chemical analysis of defendant's breath and related testimony were stricken because the test was found to have been improperly conducted. These rulings are not in issue.

Defendant objected to the reception of the officer's testimony concerning the defendant's response to the officer's invitation to rate himself on the scale of intoxication:

"Your Honor, I'm going to object based on improper foundation because he's in custody now and he's having

him do tests and he's made a determination to arrest him, he's entitled to be advised of his rights at this point.

"Judge: Objection overruled. It seems to me he hasn't told him he's under arrest yet although he certainly made the decision."

At the time of making his decision as fact finder, the trial judge stated:

"Well, I listened to this carefully and I have to disregard the evidence put in by the state on the breath test. But all in all, I'm convinced beyond a reasonable doubt that defendant was under the influence of intoxicants at the time based on the weaving which the officer testified to, the count backwards which he said he had all fouled up, the balance he said wasn't very good, and the defendant himself — when asked to rate himself between zero and ten whether sober to real drunk — said a 'low 5'. That indicates to me that he thought himself that he was somewhat affected. So the finding will be guilty of the charge."

## THE APPEAL

Upon appeal the sole assignment of error was the failure to sustain the objection to the testimony of the officer as to defendant's response to the invitation to rate himself. In his brief, defendant made it clear that he was relying on the failure of the officer to advise defendant of his rights under *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966), and several decisions of the Court of Appeals of Oregon[1] pertaining to the issue of when custody has obtained. The state joined legal issue on whether defendant was in custody when the question was put to him.

The Court of Appeals held that at the time the question was asked and answered, the encounter had become a custodial interrogation, that the trial court erred in not sustaining the objection, and that the error was not harmless beyond a reasonable doubt. We allowed the state's petition for review, in which the state urged:

"* * * A decision by this Court is needed to bring Oregon law into conformity with the decisions of the

---

[1] Defendant relied upon *State v. Brown,* 44 Or App 597, 606 P2d 678 (1980); *State v. Campbell,* 43 Or App 979, 607 P2d 745 (1979); *State v. Ferrell,* 41 Or App 51, 596 P2d 1011 (1979); and *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282 Or 189 (1978).

United States Supreme Court, and to clarify the analysis of what constitutes 'custodial' interrogation, especially in the context of on-the-scene questioning."

## CUSTODIAL INTERROGATION

Defendant has not contended that any right guaranteed to him by either the constitution or the statutes of this state has been violated. His sole claim is that his rights under the Fifth and Fourteenth Amendments to the United States Constitution have been invaded. We do not approach the case therefore upon any independent state ground; rather, we seek to divine what the United States Supreme Court should do if it had this case.

Defendant makes no assertion that his statements were involuntary in the sense that his will was overborne. His contention is only that the evidentiary use of his statement was improper because it was the product of custodial interrogation as that term is used in *Miranda v. Arizona, supra,* and it was not preceded by advice and waiver of rights as required in that case.

The simple answer is that defendant was not yet in custody when the challenged statement was made and *Miranda* procedures were not applicable. Justice Lent, in dissent, however, would hold as did the Court of Appeals that once the officer decided to arrest defendant, defendant was not actually free to leave and was in custody even though the officer had not so informed him. Justice Linde, in dissent, would hold that whenever an officer investigating a crime, whether a traffic crime or not, stops a car and asks questions, that is sufficient detention to be deemed custody for purposes of triggering *Miranda* requirements. To fully examine these views, we must more closely inquire into the meaning of "custody" as used in *Miranda.*

*Miranda* is a Fifth Amendment case dealing with voluntariness. The issue of voluntariness put the defendant's subjective state in issue, not the officer's. The historical setting and the text of *Miranda* indicates that its purpose was to simplify judicial determinations of voluntariness of statements made in custody. *Miranda* was preceded by a generation of cases in which the court made case-by-case determinations of voluntariness from the "totality of the circumstances," *e.g.,* defendant's age, educa-

tion and intelligence, the length of interrogation, access to family or counsel, etc., as to whether defendant's will was overborne.[2] An obvious intended effect of laying out specific procedures for advice and waiver of rights prior to custodial interrogation in *Miranda* was to eliminate the necessity of making circumstantial determinations about the subjective state of each defendant and to substitute a simple advice-and-waiver procedure to be followed whenever a readily discernible objective fact exists, *i.e., custody.* If those procedures are followed, voluntariness may generally be inferred.[3] Absent custody, as here, the law of the pre-*Miranda* totality-of-circumstances cases continues to apply. Were we to decide that the officer's subjective state (*i.e.,* his uncommunicated intention to arrest) triggered *Miranda* procedures, that holding would be exactly contrary to the purpose of the *Miranda* opinion: Instead of looking to an objective event, *i.e.,* custody, we would look to a subjective state—the officer's, not the defendant's. That cannot be.

■  The answer to Justice Linde's thesis requires a review of the nature of the restriction which in *Miranda* is referred to as "custody." The premise of *Miranda* is that custody is an inherently coercive situation and that procedural safeguards are a necessary device to assure voluntariness in answering custodial interrogation. The intertwined relationship of custody, coercion and safeguards was clearly stated as the underpinning of the *Miranda* opinion:

> "* * * We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the

---

[2] *See, e.g., Lisenba v. California,* 314 US 219, 62 S Ct 280, 86 L Ed 166 (1941); *Crooker v. California,* 357 US 433, 78 S Ct 1287, 2 L Ed 2d 1448 (1958); *Spano v. New York,* 360 US 315, 79 S Ct 1202, 3 L Ed 2d 1265 (1959); *Rogers v. Richmond,* 365 US 534, 81 S Ct 735, 5 L Ed 2d 760 (1961); *Haynes v. Washington,* 373 US 503, 83 S Ct 1336, 10 L Ed 2d 513 (1963); *Malloy v. Hogan,* 378 US 1, 84 S Ct 1489, 12 L Ed 2d 653 (1964).

[3] Although *Miranda* is somewhat successful in establishing a "bright line" test of custody as a triggering point for its procedures, it is not as successful in other respects. For example, we now have totality-of-circumstances waiver cases. *See, e.g., Brewer v. Williams,* 430 US 387, 97 S Ct 1232, 51 L Ed 2d 424 (1977).

privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." 384 US at 467.

"Custody" is an "elastic" term which in criminal law generally denotes "imprisonment." Black's Law Dictionary. The concern of the court in *Miranda* touched coercive situations less restrictive than actual imprisonment. Part I of that opinion dwells extensively on the court's concern about the potential evils of arrests on suspicion for the purpose of incommunicado, knee-to-knee, unceasing interrogation in the gray, windowless recesses of police stations, intended to obtain evidence of guilt to warrant a formal arrest. The totality-of-circumstances cases involving that widespread practice culminated with *Escobedo v Illinois,* 378 US 478, 84 S Ct 1758, 12 L Ed 2d 977 (1964). In retrospect, *Escobedo* was a false start: it applied Sixth Amendment analysis based on whether defendant was a "focal suspect." In *Miranda,* the court corrected course and returned to Fifth Amendment analysis of voluntariness of custodial interrogation. In doing so, the court specified that it intended a broader meaning of custody which would include situations short of imprisonment, such as detention for questioning:

> "* * * By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4] * * *
>
> _____
>
> "4. This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." *Miranda v Arizona,* 384 US at 444.

■ The significance of the disjunctive definition is emphasized by repetition. In later passages the opinion says:

> "The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station *or otherwise* deprived of his freedom of action in any significant way. * * *"

> "To summarize, we hold that when an individual is taken into custody *or otherwise* deprived of his freedom by the authorities in any significant way and is subjected to

questioning, the privilege against self-incrimination is jeopardized. * * *" (Emphasis added.) 384 US at 477-478.

The "otherwise deprived" phrase was intended to more fully explain the meaning of "custody"; it was not intended to describe another class of situations to which *Miranda* was applicable in addition to custody. Rather, the phrase reflects a realistic recognition that imposition of custody is not always formal. Custody may commence without the word "arrest" being uttered. Involuntariness which presumably is caused by the police-dominated atmosphere of custody, and which the *Miranda* procedures are intended to overcome, is equally likely in circumstances which are situationally equivalent to actual custody, whether a formal arrest has been made or not.

■ A review of post-*Miranda* United States Supreme Court cases and our own interpretive cases persuades us that the phrase "otherwise deprived of his freedom of action in any significant way," blurs the "bright line" somewhat, but was intended to refer to situations which are inherently coercive in the way that formal custody is deemed to be inherently coercive. It refers to situations of greater deprival of freedom of action than the ordinary stop of a car (or of a pedestrian, for that matter), but short of formal arrest.

The four cases decided under the name *Miranda v. Arizona* all involved actual custody, so there was no occasion to elaborate on the intended meaning of the alternate phrase. There are a few post-*Miranda* United States Supreme Court cases dealing with the meaning of *custody* other than imprisonment, *i.e.,* the phrase "otherwise deprived of his freedom of action in any significant way." In *Orozco v Texas,* 394 US 324, 89 S Ct 1095, 22 L Ed 2d 311 (1969), the court made clear that *Miranda* was equally applicable to custody outside the confines of police stations. There, four policemen, investigating a homicide, entered a suspect's bedroom uninvited. They identified him, arrested him and then questioned him.[4] That was held to be

---

[4] The dissent of Lent, J., regards the references to the time of Orozco's arrest as ambiguous and concludes that it occurred after the interrogation. From that conclusion, he infers that the United States Supreme Court in *Orozco* held that pre-arrest interrogation was nevertheless custodial. As he puts it:

custodial interrogation even though in the defendant's residence. By the use of italics, the court indicated that this situation of questioning following an arrest illustrated what they had meant to describe by their "otherwise deprived" phrase:

"* * * According to the officer's testimony, petitioner was under arrest and not free to leave when was questioned in his bedroom in the early hours of the morning. The *Miranda* opinion declared that the warnings were required when the person being interrogated was 'in custody at the station *or otherwise deprived of his freedom of action in any significant way.*' * * *." (Emphasis in *Orozco* opinion.) 394 US at 327.

"My reading of *Orozco* causes me to conclude that the United States Supreme Court believed that from the time defendant gave his name to the officers he was not free to leave and that the officers considered him to be under arrest although they had not advised the defendant that he was under arrest. In the case at bar, as in *Orozco,* the defendant had not been 'arrested,' although the officer had decided to arrest him and would not have let him depart." (Footnote omitted.) 293 Or at 85.

The dissent misreads *Orozco.* The case is not parallel to this. Orozco was under arrest from the beginning.

Any ambiguity found in the United States Supreme Court opinion may be resolved by reference to the previous opinion in the Court of Criminal Appeals of Texas, *Orozco v. State,* 428 SW2d 666 (1967). That majority opinion states that Orozco was arrested at the beginning of the interrogation as soon as they learned his identity at the beginning of the incident. 428 SW2d at 672. The Texas dissent emphasized this fact by setting out the transcript:

" 'Q. I see, when you ascertained his name, was he free to leave?

A. No.

Q. So, all right, so during the time that you had this conversation with him pertaining to the gun, he was under arrest, is that correct?

A. Yes. After I found out his name.' " *Orozco v. State,* 428 SW2d at 674.

Orozco was in custody by virtue of having been arrested. In this case, by contrast, the officer had decided to arrest the defendant in the future, but had not yet done so.

We point out this factual error only to demonstrate that the dissent's reasoning from its misreading of *Orozco* is erroneous. Perhaps if Orozco had not been formally arrested initially, the interrogation would nevertheless have been deemed custodial, but for a different reason. The police conduct in entering Orozco's room, uninvited and four strong, and then questioning him would cause Orozco to reasonably believe he was deprived of liberty and the pressures inherent in custody would equally inhere in Orozco's situation. *See* both opinions in *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282 Or 189 (1978).

In *Schneckloth v. Bustamonte,* 412 US 218, 93 S Ct 2041, 36 L Ed 2d 854 (1973), the United States Supreme Court was asked to rule that custodial consent to search should be subject to the same procedures as those imposed in *Miranda* for custodial questioning. That case, like this, involved an investigative stop of an automobile. The court declined to apply *Miranda,* primarily because Fourth Amendment searches are subject to different considerations than Fifth Amendment interrogation. The court took pains, however, to point out that common highway stops are not what they intended to describe in *Miranda* as custodial. The court stated:

"* * * *Consent searches* are part of the standard investigatory techniques of law enforcement agencies. *They normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions.* The circumstances that prompt the initial request to search may develop quickly or be a logical extension of investigative police questioning. The police may seek to investigate further suspicious circumstances or to follow up leads developed in questioning persons at the scene of a crime. *These situations are a far cry from the structured atmosphere of a trial* where, assisted by counsel if he chooses, a defendant is informed of his trial rights. Cf. *Boykin v. Alabama,* 394 U.S. 238, 243, [23 L Ed 2d 274, 89 S Ct 1709 (1969)]. *And, while surely a closer question, these situations are still immeasurably far removed from 'custodial interrogation' where, in Miranda v. Arizona, supra, we found that the Constitution required certain now familiar warnings as a prerequisite to police interrogation.* Indeed, in language applicable to the typical consent search, we refused to extend the need for warnings:

'Our decision is not intended to hamper the traditional function of police officers in investigating crime. * * * When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigations may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law

enforcement.' [*Miranda v. Arizona,*] 384 US, at 477-478."

(Emphasis added.) 412 US at 231-232.

■ This court has previously examined the nature of restraint which triggers the need for *Miranda* safeguards. Although the cases differ on their facts, they demonstrate the principle that actual (not potential) custody or significant deprival of freedom is what triggers the *Miranda* safeguards.

In *State v Travis,* 250 Or 213, 441 P2d 597 (1968), this court upheld use of statements made to an investigating officer during interrogation conducted in a police car, without an arrest. We recognized, as in *Orozco,* that *Miranda* applies to questioning outside the police station. We also recognized (as *Miranda* states in its footnote 4, set out above) that actual custody in the form of arrest or restraint, not mere focal suspicion, is the triggering event. This court said:

> "The badge of a police officer representing governmental authority, in and of itself, may have a subtly coercive effect. But we cannot believe that any psychological pressure emanating from an officer's authority is likely to cause an innocent person, who knows that he is free to come and go, to confess a crime he did not commit. Nor is a question by an officer likely to produce involuntary self-incrimination on the part of a guilty person if that person is not under arrest or under any other form of restraint.
>
> "The basis of the exclusionary rule is the Fifth Amendment guarantee against compulsion. The *Miranda* case held that police custody is 'inherently coercive.' If, in fact, there is no custody, there is no danger that a coercive environment will be created. There is no need, therefore, to indulge in a fictitious assumption that we are preventing coercion when we exclude otherwise admissible evidence." 250 Or at 217.

It is also significant to this case that the court went on to note and implicitly reject early post-*Miranda* cases from elsewhere which held that *Miranda* applies to "field interrogation of suspects * * * if police have probable cause to believe the suspect is guilty." *ibid.*

■ In *State v Taylor,* 249 Or 268, 437 P2d 853 (1968), an officer investigating an accident, questioned defendant

at the scene. The defendant gave incriminating answers indicating he had been drinking intoxicants. The officer's observations also indicated that defendant was intoxicated. Upon completion of the interrogation, the defendant was formally arrested. The officer testified, however, that from the beginning he would not have allowed the defendant to leave until the investigation was completed.[5] Thus, in *Taylor,* as here, questioning occurred at a time when the questioning officer had subjectively determined that he would not allow the defendant to leave, *i.e.,* that he would deprive the defendant of his freedom of action in a significant way, but had not yet actually restrained him or communicated that intention to the defendant. In that situation, this court held that actual custody, not the police officer's subjective intent as to action not yet taken, is controlling.

"It will be noted that [*Miranda, Escobedo* and two Oregon cases] deal with 'custodial interrogation.' The thrust of each is the danger of *compulsory* self-incrimination that arises out of the psychological effect of the custodial atmosphere which tends to overpower the mental resistance of a suspect or an accused when questioned. *Miranda* states 'that without proper safeguards the process of *in-custody* interrogation of persons suspected or accused of crime *contains inherently compelling pressures* which work to undermine the individual's will to resist and *to compel him to speak where he would not otherwise do so freely.'* (Emphasis supplied.) 384 US 436, 467.

---

[5] This is a correct statement of the facts of *Taylor* as verified by reference to the transcript excerpts in the briefs. The statement by Lent, J., in dissent, that "[o]ur decision in *Taylor* proceeded upon an implicit assumption that * * * the officer asked no questions after he concluded that defendant should be arrested" is unsupportable. (293 Or at 81-82.) The statement of facts at the beginning of the *Taylor* opinion is:

"Subsequent to the interview above set out, the officer advised the defendant he was arresting him for driving while under the influence of intoxicating liquor and notified him of his right to remain silent and his right to counsel. The officer also testified that had the defendant attempted to leave he would not have permitted him to do so until he had completed his investigation." 249 Or at 270.

The sequence would have been clearer had the two sentences of the paragraph been stated in reverse order. In fact, the timing occurred as stated above: the officer would not have let defendant leave, but did not arrest him until questioning was completed. This reading of the facts is verified by reference to transcript excerpts set out in the defendant's brief in *Taylor.* Were the dissent to take issue with *Taylor,* we would have something to discuss. It appears, however, that the dissent simply reads into *Taylor* a fact that is not there.

"There is nothing in any of these decisions that denies the police the right in on-the-scene investigations to interview any person not in custody and not subject to coercion in any form for the purpose of determining whether a crime has been committed and who committed it.

'* * * General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.' *Miranda v. Arizona,* supra, 384 US 436, 477-478.

Nor is there otherwise an iota of evidence that the statements made by the defendant were in anywise the result of compulsion." *State v Taylor,* 249 Or at 271-272.

It is possible that the defendant in this case was motivated by a purpose less lofty than "responsible citizenship," but he was not yet subject to the coercion which inheres when custody begins. More likely, a driver who voluntarily undergoes field sobriety tests does so in hopes that he will pass them and not be arrested. We never see those cases. *Miranda* deals only with the pressure which inheres in custody, not that which may inhere in trying to avoid custody. The opinion of this court in *Taylor* correctly applies the holding of *Miranda.*

Finally, in *State v Mathiason,* 275 Or 1, 549 P2d 673 (1976), the defendant came to a police station upon the officer's invitation. He was told that he was a suspect in a burglary and that there was evidence of his guilt, but that he was not under arrest. He answered questions and was allowed to leave. By a 4-3 decision, this court held that *Miranda* compliance was required because the questioning took place in a " 'coercive environment' " equivalent to the *Miranda* phrase " 'the compelling atmosphere inherent in the process of in-custody interrogation.' " 275 Or at 4-5.

Our holding was reversed in *Oregon v Mathiason,* 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977). The United States Supreme Court made clear that its holding in *Miranda* regarding custody was intended to be applied literally rather than expansively. That court held:

"Our decision in *Miranda* set forth rules of police procedure applicable to 'custodial interrogation.' 'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' 384 U.S., at 444. Subsequently we have found the *Miranda* principle applicable * * * to questioning taking place in a suspect's home, after he has been arrested and is no longer free to go where he pleases, *Orozco v. Texas,* 394 U.S. 324 (1969).

"In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. * * * It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'

"Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." (Original emphasis.) *Oregon v Mathiason,* 429 US at 495-496.

There are factual differences between this case and *Mathiason,* to be sure, but *Mathiason* reflects continuing adherence of the United States Supreme Court to what it held in *Miranda* and gives no evidence of any intention to expand that holding.

Justice Linde suggests that the rule of custody should be more definite so that police officers will know with greater certainty when to follow *Miranda* procedures. Perhaps so, but any uncertainty exists by virtue of the

imprecision of the phrase "otherwise deprived of his freedom of action in any significant way." We cannot improve on the *Miranda* opinion; we can only do our best to discern and apply its meaning.

In summary, *Miranda,* and the subsequent cases of the United States Supreme Court and this court dealing with custody as that term is used in *Miranda,* hold that actual custody or deprival of liberty in a significant way greater than that involved in on-the-scene investigation is the triggering event for *Miranda* safeguards. In the absence of actual custody or a significant deprival of liberty, there is not the subjective pressure upon a defendant which inheres in actual custody that *Miranda* was intended to overcome. If an officer merely intends to restrict freedom or impose custody, but has not yet communicated that intention or converted it into action, the pressures with which *Miranda* deals have not necessarily come into being. It would be an unwarranted extension of *Miranda* to apply it to inchoate, contemplated custody that exists only as a subjective intention in the mind of the officer as to future action. Actual custody, not intended custody, is the so-called "bright line" triggering device.

Justice Lent, in dissent, argues:

"* * * There is nothing in *Miranda* that says that the defendant must be aware that he is in custody or otherwise deprived of his freedom of action in a significant way." 293 Or at 89.

It is true that the *Miranda* opinion does not expressly exclude every possible misinterpretation, but the interpretation by the Court of Appeals is inconsistent with the underlying rationale of *Miranda:* Psychological pressures upon a defendant inhere in the fact of custody which are not necessarily present where there is no custody. It is also inconsistent with all subsequent interpretive cases dealing with custody.[6]

---

[6] Also, the reliance by the dissent upon *State v Kinn,* 288 Minn 31, 178 NW2d 888 (1970), is misplaced. That opinion is also inconsistent with the holding of *Miranda.* The holding of the Minnesota court that

"* * * When an investigation reaches a point where a police officer has reasonable grounds to believe both that a crime has been committed and that the interviewee is the culprit, and it becomes his duty to take such person into

■ We therefore conclude that *Miranda* was intended to apply to custodial situations or those situations of deprival of freedom which are sufficient in degree and apparent indefiniteness to be similarly inherently coercive. To decide this case, we need not define the line with greater precision than in *Miranda;* here, it is sufficient to conclude that the *Miranda* definition of custody refers to restrictions of greater magnitude and apparent duration than exist in an ordinary investigative traffic stop such as this.

Therefore, we would conclude that the statements in issue were properly admitted because they were the product of noncustodial questioning and because there were no indicia of involuntariness in the totality of the circumstances.

The Court of Appeals is reversed; the district court is affirmed.

## ROBERTS, J., concurring.

I voted with the majority in this case because I believe requiring the police to be sensitive to the impact of an interrogation upon a defendant is, in the long run, more protective of a defendant's constitutional rights and more consistent with the kind of safeguards *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966) meant to provide than is requiring a police officer to give a defendant the warnings required by *Miranda* at the point at which the officer has made a decision to arrest.

Were our opinion here only deciding this case and nothing more, I would have voted with the dissent by

custody, or, in other words, when the point is reached where the adversary system begins to operate, he is required to give the Miranda warning." 288 Minn at 31.

is directly contradicted by the express language of *Miranda,* particularly in footnote 4, quoted above, that the "focal suspect" phrase of *Escobedo* has been superceded by the "custody" requirement of *Miranda.* The "adversary system" phrase has its origin in the "investigatory/accusatory" Sixth Amendment language of *Escobedo.* In the Fifth Amendment context, since *Miranda,* that notion is incorporated in the concept of custody. Justice Lent notes this logical inconsistency of *Kinn* with *Miranda,* but nevertheless relies upon *Kinn* as authority. The Arizona case relied upon by the dissent demonstrates only that another court has similarly erred.

Justice Lent. My concern with the position of that dissent applied generally, however, is that making a police officer's decision to arrest the trigger point for issuance of *Miranda* warnings points the way to the possibility of police abuse, and leaves the investigatory procedure too susceptible to police manipulation. Only the officer knows at what point he or she makes a decision to arrest. By requiring that something other than the officer's state of mind be considered in determining whether or not a defendant is "deprived of his freedom of action in any significant way," *Miranda,* 384 US at 444, 477, 86 S Ct at 1612, 1629, 16 L Ed 2d at 706, 725, the officer has to make a determination of whether or not that individual would feel a significant, coercive deprivation of his or her freedom of action. It is my belief that this inquiry ultimately provides the standard of protection enunciated in *Miranda* and with which we struggle here.

**LENT, J.,** dissenting.

The problem in this case is to determine when a uniformed police officer's questioning of a motorist halted for improper driving became custodial interrogation. I would hold that it was from at least as early as the time when the officer had arrived at a decision, although uncommunicated to the motorist, to arrest him for driving while under the influence of intoxicants.

The majority purports to follow and apply the precepts of the United States Supreme Court pronounced in *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). Rather than doing so, however, the majority actually attempts to go behind the plain words of the *Miranda* decision and to retreat to a rule that the *Miranda* warnings need be given only when the defendant is found to be in some situation at least equally as coercive to his will as obtains in station house custody. I cannot help but feel that the majority reaches that result on the basis of what it wished the *Miranda* court had said, rather than what that court did say.

That court did say, as acknowledged by the majority, that the need to give the famous warnings is triggered by custodial interrogation. By that, the court said it meant questioning of a person in custody "or otherwise deprived of

his freedom of action in any significant way." 384 US at 444, 86 S Ct at 1612, 16 L Ed 2d at 706.[1] The majority first concedes that "actual (not potential) custody or significant deprival of freedom is what triggers the *Miranda* safeguards." 293 Or at 70, 644 P2d at 1111. Having made that concession, the majority then blithely ignores the fact that this defendant was not free to go because the officer would not have let him go. The majority opinion, in effect, holds that more than actual deprivation of freedom of action is required; in addition, the defendant must realize that he is not free to go.

That holding proceeds on the theory that the *Miranda* decision is somehow directed to a defendant. That is not the case. The decision does not say to the defendant: "As soon as you are aware that you are in custody or not otherwise free to leave, you must invoke your rights under the constitution if you wish to keep your answers to subsequent questioning out of evidence." The defendant's right to remain silent and to counsel does not depend upon custody. He could invoke those rights at any time if he were aware of them. *Miranda* simply demands that at a certain point he be made aware of those rights if the defendant's questioner desires to use information gained by further questioning. *Miranda* is directed to the officer; it says to him: "As soon as you have the defendant in custody or have otherwise deprived him of his freedom of action in any significant way, you must discontinue questioning defendant and give him warnings. If you fail to do so, you may not use his ensuing answers against him."

The majority's insistence that *Miranda* means that there must be some realization by the defendant that he is not free to go so as to produce a coercive atmosphere is simply an attempt to retreat to an inquiry as to whether the defendant's will has been overborne. That was the law before *Miranda,* not since.

I would commence our solving of this legal problem by proceeding to the source, the spirit and language of *Miranda.* Underlying the enunciation of the *Miranda* rules

---

[1] *See,* substantially similar definitions quoted by the majority at two other places in *Miranda v. Arizona,* 384 US 436, 477, 478, 86 S Ct 1602, 1629, 1630, 16 L Ed 2d 694, 725, 726 (1966).

was the Court's awareness of the need to prohibit overbearing governmental intrusion into personal privacy, that is, to protect the dignity and integrity of the persons subject to the laws sought to be enforced. After reviewing Anglo-American history of the privilege against self-incrimination, the *Miranda* Court said:

> "Those who framed our Constitution and the Bill of Rights were ever aware of subtle encroachments on individual liberty. They knew that 'illegitimate and unconstitutional practices get their first footing. . by silent approaches and slight deviations from legal modes of procedure.' *Boyd v. United States,* 116 U.S. 616, 635 (1886). The privilege was elevated to constitutional status and has always been 'as broad as the mischief against which it seeks to guard.' *Counselman v. Hitchcock,* 142 U.S. 547, 562 (1892). We cannot depart from this noble heritage.
>
> "Thus we may view the historical development of the privilege as one which groped for the proper scope of governmental power over the citizen. As a 'noble principle often transcends its origins,' the privilege has come rightfully to be recognized in part as an individual's substantive right, a 'right to a private enclave where he may lead a private life. That right is the hallmark of our democracy.' *United States v. Grunewald,* 233 F.2d 556, 579, 581-582 (Frank, J., dissenting), rev'd, 353 U.S. 391 (1957). We have recently noted that the privilege against self-incrimination — the essential mainstay of our adversary system — is founded on a complex of values, *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55-57, n. 5 (1964); *Tehan v. Shott,* 382 U.S. 406, 414-415, n. 12 (1966). All these policies point to *one overriding thought:* the constitutional foundation underlying the privilege is *the respect a government —* state or federal — *must accord to the dignity and integrity of its citizens.* To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' 8 Wigmore, Evidence 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. *Chambers v. Florida,* 309 U.S. 227, 235-238 (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' *Malloy v. Hogan,* 378 U.S. 1, 8 (1964)." (Emphasis added)

384 US at 459-60, 86 S Ct at 1620, 16 L Ed 2d at 715.

To enforce that respect required of the government in dealing with those subject to its laws, the Court promulgated the famous safeguards. Statements of those subjected to custodial interrogation were to be subject to exclusion from evidence unless the safeguards were used. The Court, at three places in its opinion, stated what it meant by custodial interrogation:

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise* deprived of his freedom of action in any significant way." (Emphasis added) (Footnote omitted)

384 US at 444, 86 S Ct at 1612, 16 L Ed 2d at 706.

"The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station *or otherwise* deprived of his freedom of action in any significant way." (Emphasis added)

384 US at 477, 86 S Ct at 1629, 16 L Ed 2d at 725.

"To summarize, we hold that when an individual is taken into custody *or otherwise* deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." (Emphasis added)

384 US at 478, 86 S Ct at 1630, 16 L Ed 2d at 726. Thus, we see that the *Miranda* court intended that the safeguards apply to questioning in circumstances that would not, in ordinary parlance, be considered to amount to custody.

Before proceeding to the particular aspects of the issue which grew out of the fact that we are dealing with a charge of driving while under the influence of intoxicants, I shall consider the decisions of the United States Supreme Court, other than *Miranda,* and of this court upon which the state relies. They are *Hoffa v. United States,* 385 US 293, 87 S Ct 408, 17 L Ed 2d 374 (1966); *State v. Taylor,* 249 Or 268, 437 P2d 853 (1968); *Oregon v. Mathiason,* 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977); and *United States v. Mendenhall,* 446 US 544, 100 S Ct 1870, 64 L Ed 2d 497 (1980).

The state argues that the decision of the Court of Appeals in the case at bar that defendant was in custody at the time when the officer made the decision to arrest offends the holding of *Hoffa v. United States, supra.* The state relies upon a statement extracted from that decision:

"Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."

385 US at 310, 87 S Ct at 417, 17 L Ed 2d at 386. That statement is not applicable to when *Miranda* warnings are to be given. The *Miranda* court was not concerned with the question as to when an arrest is to be made in the evidence gathering continuum or when a criminal investigation must cease. Nothing in *Miranda* states that the criminal investigation must cease when the suspect is in custody or otherwise deprived of his freedom of action in a significant way. That decision simply requires that the police must at that time and in those circumstances give the prescribed warnings. The failure to give the warnings may result in being unable to use the suspect's further statements in evidence, but the police are not required to discontinue investigation. Indeed, if the suspect gives up his right to remain silent and to have counsel, the police may continue the investigation by interrogation of the suspect.

When it made the statement here relied upon by the state, the *Hoffa* court was not even discussing a claim of violation of the defendant's rights under the Fifth Amendment to the United States Constitution and *Miranda;* rather, the statement was made in the course of discussing the defendant's claim that his Sixth Amendment right to counsel had been invaded by the actions of a government informer. As the Court pointed out, defendant was trying to assert a claim cognizable in the circumstances concerned in *Massiah v. United States,* 377 US 201, 84 S Ct 1199, 12 L Ed 2d 246 (1964), and the circumstances of the informer's evidence gathering in *Hoffa* simply did not fit the *Massiah* mold.

That the state did rely upon the quotation from *Hoffa* is understandable, however, because of the statements of this court in *State v. Taylor, supra.* We there made

the same misuse of the language of *Hoffa*. In *Taylor* a police officer heard the sound of a vehicle collision and went to investigate. The officer asked the defendant several questions designed to elicit information as to ownership of one of the vehicles, whether defendant had been driving, whether he had been drinking and how much, and whether defendant was oriented as to his surroundings. This conversation also gave the officer an opportunity to observe defendant's appearance, demeanor and speech. After the conversation, the officer advised defendant that he was being arrested and gave him warnings of his right to remain silent and to counsel. The officer later testified that he would not have allowed defendant to leave until the officer had completed his investigation. Defendant objected to the evidence of any of the conversation, relying upon his rights under the Fifth and Sixth Amendments as interpreted in *Miranda* and *Escobedo v. Illinois*, 378 US 478, 84 S Ct 1758, 12 L Ed 2d 977 (1964). We noted that those cases dealt with "custodial interrogation" and espoused our view of the "thrust" of those cases. We then observed that there was nothing in those cases to prevent on-the-scene investigation by interviewing "any person not in custody and not subject to coercion in any form for the purpose of determining whether a crime had been committed and who committed it." 249 Or at 271, 437 P2d at 855. We were quite correct in that observation if we used the word "custody" in the *Miranda* sense. We went on to state that the officer was performing his duty to investigate the collision and its cause and, in doing so, to determine whether the cause was due to a violation of the law and, if so, to cite defendant for violation. We further stated that such information was necessary in order to justify placing a person under arrest and then quoted the language from *Hoffa* set forth above. We noted that the officer had asked more questions than the minimum "necessary to establish probable cause" but that "as soon as he concluded that an arrest should be made he stopped the questioning." We concluded, therefore, that the officer's investigation did not produce inadmissible evidence under the *Miranda* rule.

Our decision in *Taylor*, insofar as it relied upon the quotation from *Hoffa*, simply missed the mark for the reasons set forth above. Our decision in *Taylor* proceeded

upon an implicit assumption that the fact that the defendant was not free to leave was immaterial and that since the officer asked no questions after he concluded that defendant should be arrested, defendant's *Miranda* rights had not been violated. In that last respect we were certainly correct, but we failed explicitly to come to grips with whether "custody" in either of the two *Miranda* senses occurred prior to formal arrest. Certainly, our adoption of the words from *Hoffa* uttered concerning a claim of infringement of the constitutional right to counsel was not apropos to determining when the police had deprived the defendant of his freedom of action in any significant way. Insofar as our decision in *State v. Taylor, supra,* could be understood as fixing the time a person is placed under arrest[2] as the earliest time at which he is entitled to *Miranda* warnings, that decision should be disavowed.

The state and the majority both rely upon *Oregon v. Mathiason, supra.* The majority quotes at length from dictum of *Mathiason.* I find nothing in that quotation to support that proposition for which the state and the majority contend. Having iterated the *Miranda* holding by quoting the same language pertaining to custodial interrogation I have above quoted from that decision, the *Mathiason* court proceeded to the holding of the case and found that the defendant there did not come within the scope of the *Miranda* language:

> "In the present case, however, there is *no indication that* the questioning took place in a context where *defendant's freedom to depart was restricted in any way.* He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a 1/2-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.' " (Emphasis added)

429 US at 495, 97 S Ct at 714, 50 L Ed 2d at 719. The key to the decision in *Mathiason* was that defendant was

---

[2] Inherent in using "arrest" as the trigger point for the necessity of *Miranda* warnings is that the federal constitutional right would be made dependent on various state definitions of "arrest," a word not used in the Fifth Amendment or, for that matter, in the Fourth and Sixth Amendments.

invited to go to the station house, that he went there voluntarily, that he was told that he was not under arrest and that he was allowed to depart after the half-hour interview. The difference between those circumstances and those presented in the case at bar are readily apparent. This defendant was not advised he was free to leave; he was, in fact, not free to leave; he did not, in fact, leave.

The state relies upon *United States v. Mendenhall, supra,* for the contention that, absent communication to the defendant of the officer's decision to arrest, "it cannot be said that the officer's subjective intention operated to create a compelling or coercive environment." We have not been directed to any particular part of the *Mendenhall* opinion for support of that contention. My review of that opinion reveals that the entire concern of both the concurring and dissenting judges was with Fourth Amendment issues and that nothing in the various opinions in that case touches upon the Fifth Amendment or the cases concerned with custodial interrogation.[3] Accordingly, I shall forego any further consideration of that authority.

Having concluded my review of the decisions of the United States Supreme Court and of this court upon which the state relies, I now turn my attention to a decision which I believe casts some light on how the United States Supreme Court might view the question of custodial interrogation as it applies to a person questioned away from the station house and in circumstances where the officers would not have let him depart and, in fact, considered that he was under arrest, although this had not been communicated to the interviewee. That case is *Orozco v. Texas,* 394 US 324, 89 S Ct 1095, 22 L Ed 2d 311 (1969).

In *Orozco* defendant had been involved in a quarrel shortly after midnight. A shot was fired, killing a man. Defendant left the scene. About four hours later, four police officers came to defendant's bedroom in a boarding house and began to question him.

---

[3] In part II-A of his opinion "of the court," Mr. Justice Stewart does discuss a description of what amounts to a "seizure" for Fourth Amendment purposes, and uses some language similar to that used by the *Miranda* court in describing custodial interrogation, but seven members of the court did not join in that part.

"From the moment he gave his name, according to the testimony of one of the officers, petitioner was not free to go where he pleased but was 'under arrest.' "

394 US at 325, 89 S Ct at 1096, 22 L Ed 2d at 314. The officers did not give defendant any warning that he had a right to remain silent[4] but continued to question him and elicited highly incriminating evidence. Defendant timely objected to the evidence thus obtained on Fifth/Fourteenth Amendment grounds, but the evidence was received and defendant was convicted. The conviction was reversed, the *Orozco* majority finding that the questioning occurred while defendant was in custody within the meaning of *Miranda*.

I suppose that *Orozco* has not been cited to us because of confusion as to whether defendant had been placed under "arrest" prior to the pertinent questioning. The *Orozco* majority opinion refers to arrest as I have above quoted, and I think that a fair appraisal of that manner of presenting the scene was meant to convey the fact that the officer considered that defendant was under arrest although defendant had not been so informed. On the other hand, the *Orozco* majority opinion later states:

"According to the officer's testimony, petitioner was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning."

394 US at 327, 89 S Ct at 1097, 22 L Ed 2d at 315. That this last quotation erroneously indicates that defendant had been placed under arrest is borne out by the way in which the *Orozco* dissent treats the case. The dissenters acknowledged that "[o]nce arrest occurs, the application of *Miranda* is automatic." 394 US at 329, 89 S Ct at 1098, 22 L Ed 2d at 316. Further on in the dissent it is stated:

"Surely had he refused to give his name or answer any other questions, they would have arrested him anyway * * *."

"* * * * *

"* * * If the *Miranda* warnings have their intended effect, and the police are able to get no answers from suspects, innocent or guilty, without arresting them, then

---

[4] The incident apparently took place prior to the *Miranda* decision, but the trial was held after the effective date of that decision.

a great many more innocent men will be making unnecessary trips to the station house. Ultimately it may be necessary to arrest a man, bring him to the police station, and provide a lawyer, just to discover his name."

394 US at 330-31, 89 S Ct at 1099, 22 L Ed 2d at 317. If, as the majority in the case at bar believes, Orozco was believed by the United States Supreme Court to have been placed under arrest as soon as he identified himself to the officers, the dissenters in that court were certainly obtuse in failing to recognize that fact.

My reading of *Orozco* causes me to conclude that the United States Supreme Court believed that from the time defendant gave his name to the officers he was not free to leave and that the officers considered him to be under arrest although they had not advised the defendant that he was under arrest.[5] In the case at bar, as in *Orozco,* the defendant had not been "arrested," although the officer had decided to arrest him and would not have let him depart.

The majority in the case at bar asserts that an examination of the opinion of the state court, *Orozco v. State,* 428 SW2d 666 (Tex Cr App 1967), demonstrates that Orozco was under formal arrest. I submit the language which the majority quotes from the Texas court's opinion does *not* show that the magic concept of "arrest" had been communicated to Orozco. Moreover, it is not important what the actual situation was; it is what the United States Supreme Court perceived it to be that must be considered in determining the effect to be given to *that court's*

---

[5] Later cases indicate continued confusion as to whether members of the *Orozco* court believed Orozco had or had not been "arrested." Only two years later, Justice Douglas referred to the case in a concurring opinion in *United States v. Marion,* 404 US 307, 92 S Ct 455, 30 L Ed 2d 468 (1971), describing the fact situation in *Orozco v. Texas,* 394 US 324, 89 S Ct 1095, 22 L Ed 2d 311 (1969), as follows:

"We applied the *Miranda* rule even though there was no 'arrest,' but only an examination of the suspect while he was in his bed at his boarding house, the presence of the officers making him 'in custody.'"

404 US at 333, 92 S Ct at 470, 30 L Ed 2d at 486.

On the other hand, statements in opinions in *Michigan v. Tucker,* 417 US 433, 460, 94 S Ct 2357, 2372, 41 L Ed 2d 182, 202 (1974) (White, J., concurring), and in *Oregon v. Mathiason,* 429 US 492, 494-95, 97 S Ct 711, 713-14, 50 L Ed 2d 714, 719 (1977), proceed upon an understanding that Orozco had been indeed arrested.

decision. The majority does not meet what I have pointed out as to how the various opinions in *Orozco* indicate that formal arrest had not occurred.

The state argues that the circumstances of "[t]his case" did not "involve any of the coercive restraints or psychological pressures to which the procedural safeguards of *Miranda* were intended to apply." This argument simply misses the mark; it ignores what the *Miranda* court did. Prior to *Miranda* the relevant inquiry was whether, *in fact,* the defendant's confession or admission was made voluntarily. This required an ad hoc determination in every instance in which voluntariness had to be litigated. The *Miranda* court reviewed the circumstances attendant upon custodial interrogation and found that inherent in such interrogation were elements of coercion and pressure that often overcame the will of the person interrogated. The court decided to draw a "bright line," i.e., to announce a per se rule. Henceforth, one subjected to custodial interrogation, as defined by the court, was to be given certain warnings concerning his rights. If the warnings were not given to the person entitled thereto, his statements made by him during the custodial interrogation could not be used against him over his objection. If he were in custody, as defined, it would make absolutely no difference at all that the interrogation was, *in fact,* completely polite and gentle, devoid of all actual coercion or pressure, insofar as the government's right to use the results of the interrogation was concerned. The inquiry, therefore, is not whether a given case presents actual "coercive restraints or psychological pressures," but whether the person is in custody as defined in *Miranda.* It does not matter whether "this case" involves elements which, pre *Miranda,* would have been used to test for voluntariness. The only relevant inquiry is whether this defendant was "in custody or otherwise deprived of his freedom of action in any significant way." If so, at that point the officer had to administer the *Miranda* warnings in order for the state to use the fruits of further interrogation.

The state also contends that this was a "typical traffic stop investigation." That may or may not be so, depending upon how one looks at it. Consider, that in cases in which one is accused of violation of the basic rule,

violation of the rules of the road, operating a vehicle with improper or defective equipment, and like charges, the officer has already personally observed all of the elements of the offense before he signals the motorist to stop the vehicle. It is the officer's observation of a violation of the law which occasions the stop. He has no further need to investigate except to obtain identification of the driver in order to charge him by correct name.

Such is not the case with respect to the offense of operating a vehicle while under the influence of intoxicants. True, the officer has probably observed some other traffic violation· which triggers his decision to signal the motorist to stop. A good example is found in the case at bar where the officer has observed a vehicle being operated in a winter month at a time of darkness in a rural area at a very high rate of speed and in a manner so erratic as to arguably support a charge of reckless driving. At the time the officer signalled defendant to a stop, he had more than enough evidence to support a charge of violation of the basic rule, and this could well have been a typical stop upon that charge. In order to gather evidence of driving while under the influence of intoxicants, however, the officer had to do something after the "typical traffic stop." He had to obtain evidence that the defendant was "under the influence."

The typical way in which an officer goes about gathering that additional evidence which would prove the element of being under the influence is by way of exercise of the officer's senses of smell, sight and hearing and by way of interview. The officer may determine through his sense of smell that the driver has consumed an alcoholic beverage. Through his sense of sight he may observe whether the driver's face is flushed, the appearance of his eyes and the orderliness of his clothing. Through the same sense the officer may observe the driver's ability to control his body and limbs. Through the sense of hearing the officer can determine whether the driver's diction and enunciation are apparently out of norm and whether the driver is able to express his thoughts in a logical manner. The process of interviewing is an aid to the officer in gathering that kind of evidence, but it is also utilized to gather evidence by way of admissions and to rule out claims of injury or illness as a cause of the driver's condition.

In this case the officer employed such methods of investigation. He smelled the odor of alcoholic beverage on defendant's breath and observed that defendant's face was flushed and that his eyes were watery and bloodshot. The officer saw that defendant swayed back and forth and heard him make a cocky answer to a question as to the extent of his education. Apparently, it was the totality of those things, taken together with the defendant's improper driving, which led the officer to the decision to conduct the "field sobriety tests" described in the majority opinion. According to his testimony, when the tests had been completed the officer had decided to arrest, and the defendant from that time on was, *in fact,* not free to leave, even though he was not aware of the officer's decision. Defendant was, *in fact,* deprived of his freedom of action in a significant way, and that should be the end of the inquiry.[6]

---

[6] I believe *Miranda* fixes the time when defendant is, *in fact,* deprived of his freedom of action as a time when the interrogation becomes custodial. We came close to recognizing in *State v. Taylor, supra,* that it was the fact that there was enough evidence to arrest that triggered the obligation to warn. As we there said:

> "In the case at bar the officer asked more questions than the minimum necessary to establish probable cause, *but as soon as he concluded that an arrest should be made he stopped the questioning and advised the defendant of his rights.* No questions were asked after the defendant was arrested. Under these circumstances, we hold that the officer's investigation did not produce inadmissible evidence under the *Miranda* rule." (Emphasis added)

249 Or at 272, 437 P2d at 855. There, as here, it is quite obvious that the defendant would not have been free to leave; he was in custody even prior to being told he was under arrest. We didn't there say anything that would make *Miranda's* applicability dependent upon the defendant's awareness of the loss of his freedom.

I would agree with the Minnesota and Arizona decisions:

> "It is not necessary that a Miranda warning be given by police officers, upon arrival upon the scene of an investigation of a possible criminal offense, to everyone from whom they elicit information in the course of their investigative work. When an investigation reaches a point where a police officer has reasonable grounds to believe both that a crime has been committed and that the interviewee is the culprit, and it becomes his duty to take such person into custody, or, in other words, when the point is reached where the adversary system begins to operate, he is required to give the Miranda warning."

*State v. Kinn,* 288 Minn 31, 178 NW2d 888, 889 (1970). *See also Campbell v. Superior Court,* 106 Ariz 542, 479 P2d 685 (1971), where the court addressed the same question, saying:

> "It is the opinion of this court that *Miranda* is not applicable to the routine traffic offense where the driver is detained no longer than is necessary to make out the citation and have it signed pursuant to A.R.S. § 28-1054.

At that point, the failure to warn him of his *Miranda* rights obviated the necessity of determining whether his answer to the ensuing question was "voluntary," for in *Miranda* the Court decided that determination was no longer to be necessary but was to be replaced by a per se rule, a so-called "bright line." There is nothing in *Miranda* that says that the defendant must be aware that he is in custody or otherwise deprived of his freedom of action in a significant way.

The point at which the defendant is in custody or otherwise deprived of his freedom of action in any significant way marks a crucial point in the process. At that point, ruled the *Miranda* court, the defendant should be advised of the constitutional guarantees that he shall not be "convicted out of his own mouth" in ignorance of those guarantees.

Since it pegged its decision to the officer's uncommunicated decision to arrest, the Court of Appeals did not

---

However, Miranda warnings must be given when the officer determines that the provisions of A.R.S. § 28-1053 come into play or an arrest for a misdemeanor or felony is to be made. At this time the person is being 'deprived of his freedom of action in [a] significant way.' Miranda v. State of Arizona, 384 U.S. 436, 477, 86 S. Ct. 1602, 1629, 16 L.Ed.2d 694 (1966); Orozco v. Texas, 394 U.S. 324, 327, 89 S. Ct. 1095, 1097, 22 L.Ed.2d 311 (1969). The reporter's transcript reflects the appropriate Miranda warnings were given by the officer prior to any questioning regarding the state of intoxication of the defendant."

106 Ariz at 552, 479 P2d at 695 (footnote omitted).

Of course, for most purposes *Miranda* has superseded the decision in *Escobedo v. Illinois,* 378 US 478, 84 S Ct 1758, 12 L Ed 2d 977 (1964), but it is interesting to note the language of the *Escobedo* court:

"We hold only that when the process shifts from investigatory to accusatory — *when its focus is on the accused and its purpose is to elicit a confession* — *our adversary system begins to operate,* and, under the circumstances here, the accused must be permitted to consult with his lawyer." (Emphasis added)

378 US at 492, 84 S Ct at 1766, 12 L Ed 2d at 987. It is true that the decision in *Escobedo* was written in terms of Sixth/Fourteenth Amendment analysis, but in *Miranda* the court stated flatly that its definition of custodial interrogation, quoted in the majority opinion at 293 Or 66, 644 P2d 1109, is "what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." Fn. 4, 384 US at 444, 86 S Ct at 1612, 16 L Ed 2d at 706. In the case at bar, at least as early as the time the officer decided to arrest the defendant, the focus of the process was on the defendant, and the officer's purpose was to elicit an admission. The majority treats the famous footnote 4 of *Miranda* as superseding *Escobedo.* Actually, footnote 4 says the two concepts mean the same thing.

need to reach the full text of defendant's objection in the trial court:

"Your Honor, I'm going to object based on improper foundation because he's in custody now and he's having him do tests and he's made a determination to arrest him, he's entitled to be advised of his rights at this point.

"Judge: Objection overruled. It seems to me that he hasn't told him he's under arrest yet although he certainly made the decision."

Of course, the record discloses circumstances in this case that would lead any reasonable man in the position of the defendant to realize that he was not free to leave. He had been signalled to stop his vehicle by the officer's emergency light, and if he had not obeyed that signal, he would have been guilty of the crime of fleeing or attempting to elude a police officer.[7] He was performing a variety of tests at the behest of the officer. It defies common sense to suggest that in those circumstances a reasonable person would believe anything other than that he was not free to leave.

I need not decide whether *Miranda* warnings were required prior to the time when the officer asked the question with which this case is concerned.[8] Immediately prior to the time the question was asked, a reasonable person in the same circumstances would have believed he was not free to leave, and this defendant was, *in fact,* not

---

[7] ORS 487.555 provides:

"(1) A driver of a motor vehicle commits the crime of fleeing or attempting to elude a police officer if, when given visual or audible signal to bring the vehicle to a stop, he knowingly flees or attempts to elude a pursuing police officer.

"(2) The signal given by the police officer may be by hand, voice, emergency light or siren.

"(3) As used in this section, 'police officer' means a sheriff, municipal policeman or member of the Oregon State Police in uniform, prominently displaying his badge of office or who is operating a vehicle appropriately marked showing it to be an official police vehicle.

"(4) Fleeing or attempting to elude a police officer is a Class A misdemeanor."

[8] Justice Linde would hold that *Miranda* warnings must be given before any questions are put to the driver concerning his consumption of intoxicants and the effect thereof on the driver. It is not necessary to go that far to decide this case.

free to leave by reason of the officer's decision to prevent defendant's leaving. I would hold that the question was, therefore, custodial interrogation, and the defendant's objection should have been sustained.[9]

It is important to realize that this does not mean that the officer could not have conducted such further investigation as was lawful to gather further evidence to substantiate the charge. He could not, however, seek to convict the defendant by questioning him to obtain admissions or a confession unless he observed the *Miranda* safeguards.

Peterson, J., joins in this dissenting opinion.

**LINDE, J.,** dissenting.

The great virtue of a rule requiring police warnings to suspects whom an officer detains for questioning is, or should be, that the rule tells the officer what to do and when to do it. As Justice Lent's dissent states, the federal or "Miranda" rule[1] is addressed to the police officer, not to the detained person. The test of an opinion that purports to elucidate the rule is how clearly it tells the police under what circumstances to warn such a person before questioning. Police officers deserve and efficient law enforcement requires rules that are clear at the time of the investigatory act; a formula designed only for retrospective judgment on a motion to suppress evidence confuses the rule with its consequence. I regret that the Court's opinion in this case fails the test.

---

[9] A Washington court has held that where an officer has stopped a vehicle being improperly driven, smelled a strong odor of alcohol in the vehicle, observed other signs that the driver had been drinking, and the officer desires to confirm his suspicions that the driver is under the influence of intoxicants by conducting field sobriety tests, the *Miranda* warnings must be given.

"Once the trooper's reasoning brought him to request these tests, *Miranda* applied, not to the tests about to be performed, but to any statements defendant might make during the giving of such tests. Once the *Miranda* warning was given, defendant would know he could refrain from making any statements while performing the tests."

*State v. Darnell,* 8 Wash App 627, 508 P2d 613, 615 (1973).

[1] From *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

At least the Court's opinion is limited to its interpretation of federal constitutional law, the defense characteristically having made no effort at an independent analysis under Oregon law.

"Miranda warnings" must precede questioning not only when a person detained by the police is "arrested" or "in custody" but whenever the person is "otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona, supra,* 384 US at 444. As these important words stand in the way of the majority's conclusion, the bulk of its opinion is devoted to forcing them back under the cover of "custody." Exactly therein lies its failure to serve the essential need for clarity.

A police officer's decision to give or not to give "Miranda warnings" before questioning a suspect must be made in a factual setting, not upon a legal analysis. "Custody" is a legal characterization, not a fact. For other purposes, Oregon statutes sometime define 'custody' as the restraint that follows an arrest, and "arrest" as taking a person into custody. ORS 133.005(1), ORS 162.135(3). Confronted with this "circularity," the Court of Appeals has held that when a person in the position of the present defendant took off across the fields after the sobriety tests, he was not guilty of escape from "custody" for purposes of that crime. *State v. Swanson,* 34 Or App 59, 578 P2d 411 (1978). Patently such statutory terms do not control the reach of *Miranda* requirements. By adding "otherwise deprived of his freedom of action," *Miranda* stated a factual test divorced from the legal ambiguity of "custody;" it also made clear that physical "custody" in the sense of imprisonment or similar confinement is not required.

Seen from the perspective of an officer who must decide whether to warn before questioning, a person will clearly be deprived of his freedom of action under two circumstances. An officer who knows that he would not let a detained person leave at will also knows that the person has lost his freedom of action, whatever the person's own perception may be. Second, apart from intent, an officer can determine whether the objective circumstances under which he detains a person in fact lead the person reasonably to believe that he or she is not free to leave until the officer is satisfied. Both of these are manageable, common sense, factual determinations. If an officer does not mean to deprive the addressee of his questions of freedom to leave at will, he can easily tell the person so.

There is a great deal of difference between a simple inquiry by a police officer on the street, in commercial or other quarters open to the public, or on a doorstep, and questioning of a motorist stopped by a pursuing police car. No officer needs to be in doubt whether such a motorist has been "deprived of his freedom of action in [a] significant way," if that test is to be given a common sense meaning. A driver is obliged to obey a police officer's signal to stop at the risk of criminal punishment. ORS 487.555.[2] He may still be guilty of "fleeing" if he attempts to drive away without permission after being stopped.[3] At least he has reason to assume as much. If he has surrendered his operator's license to the officer, he is likely to assume that he can leave only by abandoning his car, unless a passenger can drive it.[4] In short, the typical stop of a vehicle for a citation or further investigation is not analogous to a pedestrian's street encounter with an officer who seeks answers to a few questions; both the legal and the factual constraints on leaving the scene of the vehicle stop are greater, or appear so to a motorist. There is a chance that a pedestrian will know that he need not perform a "field sobriety test" or answer questions in order to be free to go

---

[2] ORS 487.555:

"(1) A driver of a motor vehicle commits the crime of fleeing or attempting to elude a police officer if, when given visual or audible signal to bring the vehicle to a stop, he knowingly flees or attempts to elude a pursuing police officer.

"(2) The signal given by the police officer may be by hand, voice, emergency light or siren.

"(3) As used in this section, 'police officer' means a sheriff, municipal policeman or member of the Oregon State Police in uniform, prominently displaying his badge of office or who is operating a vehicle appropriately marked showing it to be an official police vehicle.

"(4) Fleeing or attempting to elude a police officer is a Class A misdemeanor."

[3] *State v. Swanson, supra,* assumed without discussion that the section did not apply to flight on foot. 34 Or App at 60, n. 1.

[4] ORS 482.040(2)(b):

"The licensee shall have such license in his immediate possession at all times when driving a motor vehicle, and shall display it upon the demand of a justice of the peace, a peace officer, or a field deputy or inspector of the division. It is a defense to any charge under this subsection that the person so charged produce in court an operator's or chauffeur's license that had been issued to him and was valid at the time of his arrest."

on his way. The chance that a motorist believes this seems slight indeed. Of course, if the state can show in a given case that the halted motorist did consider himself free to leave or that the officer so informed him, his answers to the officer's questions may be admissible.[5]

None of this means that an officer must give "Miranda warnings" every time he makes a traffic stop and demands to see an operator's license, or even before examining a driver's appearance and behavior for signs of intoxication. Warnings must be given only in advance of questioning the driver when the officer's investigation concerns a suspected criminal offense. They are not required in all traffic stops, but only when the object of the officer's questions extends beyond citation for a noncriminal infraction to the investigation of a suspected crime, whether this is a traffic crime, a burglary, or theft of the automobile itself. Prosecution for driving under the influence of intoxicants is as much a criminal prosecution as if it were for any crime unrelated to driving. *Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 570 P2d 52 (1977). "Miranda warnings" are part of the procedural costs of using the criminal process to deal with the drinking driver just as were the jury trials and statutory rights to counsel involved in that case. After much study and debate, the Legislative Assembly recently rejected a recommendation to try a different approach and decided to retain and to reenforce the punishments and attendant procedures of the criminal law. Or Laws 1981 ch 803.[6] There can be no question that "Miranda warnings" apply in investigations of suspected crime on wheels as well as on foot, horseback, or water.

---

[5] The state has the burden to show that a defendant's admissions to a police officer are admissible as evidence against him. *State v. Brewton,* 238 Or 590, 603, 395 P2d 874 (1964), *cf. State v. Robinson,* 3 Or App 200, 204-205, 473 P2d 152 (1970), *Dorsciak v. Gladden,* 246 Or 233, 425 P2d 177 (1967), *State v. Cohn,* 43 Or App 913, 915, 607 P2d 729 (1979), *State v. Thomas,* 13 Or App 164, 168, 509 P2d 446 (1973), *State v. Johnson,* 11 Or App 12, 17, 500 P2d 478 (1972).

[6] The recommendation to move the emphasis to license suspension and strict enforcement of the licensing laws came from the Oregon Commission on the Judicial Branch. *See* 1980 Report of the Oregon Commission on the Judicial Branch 52-62. *See also,* HB 2697, 61st Or Leg Assemb, Reg Sess (1981). The recommendation to retain the criminal process and punishments came from the Special Courts Committee of the Judicial Conference. *See* HB 2010, 61st Or Leg Assemb, Reg Sess (1981).

The majority opinion, however, fails in the crucial task of explaining when *Miranda* warnings must be given to a suspect who is questioned by officers after being stopped in his car. The mere paraphrase "actual custody or significant deprival of liberty," 293 Or at 74, does nothing to advance clarity. Nor does the phrase "greater than that involved in on-the-scene investigation" if it implies, erroneously, that "significant deprival of liberty" depends on the distance between the place of questioning and the "scene" of the suspected offense. Given the uses of precedent, this case likely will be cited for the proposition that a person has not been significantly deprived of freedom of action for *Miranda* purposes as long as he is in his own car, even if it is surrounded by several patrol cars and officers with drawn weapons, although of course the opinion does not so hold. Alternatively, it may be thought to stand for the proposition that the crime of driving under the influence of intoxicants somehow is *sui generis* as far as *Miranda* warnings before questioning are concerned. The principle at issue here deserves a clearer and more usable statement from this court.

I would affirm the Court of Appeals.