**Christina MILLER, Celelia Mathews, and Lisa Hancock, Plaintiffs,**

v.

**D.F. ZEE'S, INC., Denny's, Inc., Flagstar Corporation, Robert Pust, and the IRA Account of Robert Pust, Defendants.**

**Civil No. 96–1170–AA.**

United States District Court, D. Oregon.

Nov. 25, 1998.

Stephen L. Brischetto, Portland, OR, Scott T. Cliff, Wilsonville, OR, for plaintiffs.

Corbett Gordon, Richard R. Meneghello, Corbett Gordon & Associates, P.C., Portland, OR, for defendants Denny's, Inc. and Flagstar Corporation.

J. William Savage, Paul G. Ellis Rieke & Savage, P.C., Portland, OR, for defendants D.F. Zee's, Inc., Robert Pust and the IRA Account of Robert Pust.

## OPINION AND ORDER

AIKEN, District Judge.

On August 16, 1996, four female employees of a Denny's restaurant located in Tualatin, Oregon, filed suit against defendants D.F. Zee's, Inc., Robert Pust, and the IRA Account of Robert Pust ("Zee's"), Flagstar Corporation, and Denny's, Inc. ("Denny's"), for sex discrimination, harassment, retaliation, and constructive discharge under the Civil Rights Act of 1964, 42 U.S.C. § 2000e; and stating common law claims for wrongful discharge and the intentional infliction of emotional distress. Or.Rev.Stat. § 650.030. Plaintiffs allege that Stanley Templeton, the General Manager of the Tualatin Denny's, and other employees created a hostile work place through sexually inappropriate comments and conduct.

The Tualatin Denny's restaurant is owned and managed by a partnership entitled D.F. Zee's/Denny's Tualatin. D.F. Zee's, Robert Pust and the IRA Account of Robert Pust are all partners in the Partnership. Denny's, Inc. is a wholly-owned subsidiary of Flagstar Corporation.

Plaintiffs commenced employment in 1995. Hancock started working as a server in July 1995. Mathews started work as a server in August 1995, and Miller began work as a server in September 1995. The fourth plaintiff, Carmen Fortuny, filed a stipulated motion to dismiss all claims against all defendants. That motion was granted by this court.

Mathews did not fill out a job application, tax form, or other documents. She was hired based upon a verbal interview. Hancock and Miller each filled out employment applications containing agreements for employment with Denny's, Flagstar, or both. Each of the plaintiffs believed they were "Denny's" employees. Servers wore Denny's uniforms. Denny's signs and logos were prominently displayed throughout the restaurant. There was no observable indication in the restaurant that the Tualatin Denny's was a franchise restaurant and there was no indication who its owners were, other than "Denny's."

Zee's filed a motion for summary judgment arguing that it is entitled to summary judgment on the merits as to each of plaintiffs' claims. Denny's also brings a summary judgment motion, but argues that neither Denny's nor Flagstar is liable under Title VII or Oregon law for plaintiffs' claims since they did not employ plaintiffs. Both motions are denied.

### STANDARDS

#### 1. SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of a fact is determined by the substantive law on the issue. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.1987). The authenticity of a dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the ab-

sence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Electrical,* 809 F.2d at 630.

### 2. EMPLOYMENT DISCRIMINATION

In order to establish a claim under Title VII for sex discrimination:

> a plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.

*Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994)(internal quotation omitted).

■ Similarly, to succeed in a retaliation claim plaintiff must demonstrate that she engaged in a protected activity, her employer subjected her to an adverse employment action, and there is a causal link between the protected activity and the employer's action. *Trent v. Valley Electric Ass'n, Inc.,* 41 F.3d 524, 526 (9th Cir.1994). Once the plaintiff makes out a *prima facie* case of retaliatory discharge under *Wallis, supra,* the burden of production shifts to the employer to offer a legitimate reason for the termination. *Wallis,* 26 F.3d at 889. At that point, plaintiff must "produce specific, substantial evidence of pretext." *Wallis,* 26 F.3d at 890. This is not an onerous burden: the plaintiff who has established a *prima facie* case "need produce very little evidence of discriminatory motive to raise a genuine issue of fact as to pretext." *Warren v. City of Carlsbad,* 58 F.3d 439, 443 (9th Cir.1995), *cert. denied,* 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

■ The requisite degree of proof necessary to establish a *prima facie* case for Title VII claims on summary judgment is minimal "and does not even need to rise to the level of a preponderance of the evidence." *Wallis,* 26 F.3d at 889. The plaintiff need only offer evidence which "gives rise to an inference of unlawful discrimination." *Lowe v. City of Monrovia,* 775 F.2d 998, 1005 (9th Cir.1985).

■ Once a *prima facie* case has been made, the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the defendant fulfills this burden of production by offering a legitimate, nondiscriminatory reason for its employment decision, the presumption of unlawful discrimination "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

■ Finally, the burden switches back to the plaintiff to demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory. *Lowe,* 775 F.2d at 1005.

■ Under state law, proof of a *prima facie* case is all that is needed to defeat a motion for summary judgment. *Messick v. Horizon Industries, Inc.,* 62 F.3d 1227, 1232 (9th Cir.1995).

### DISCUSSION

#### 1. ZEE'S MOTION FOR SUMMARY JUDGMENT

##### A. Sexual Harassment and Retaliation

Zee's motion for summary judgment on plaintiffs' claims of sexual harassment and retaliation is denied.

Plaintiffs allege that defendant Templeton created a sexualized atmosphere in the workplace which included joking, touching, requests for dates, requests for sex, and other sexual comments and remarks.

In August 1995, Templeton patted a hostess, Carmen Fortuny on the buttocks. Fortuny and her fiancee confronted Templeton regarding his conduct and were dissatisfied with his response. Fortuny promptly quit.

Miller complained to Templeton regarding his conduct and that of several other male employees. Miller alleges that the cook made suggestive remarks to Miller and kissed her on the back of the neck. Miller's boyfriend came to the restaurant and got in an argument with the cook and told the cook to tell Templeton "and the [busboys]" to keep their hands off Miller. When internal complaints were unavailing, Miller left the workplace.

Mathews complained to Templeton and the other managers Sabrina Lehnhart and Ron Wilson. Wilson, as the Assistant Manager, knew of the sexual conduct in the workplace but did not feel it was his place to take action.

In November 1995, plaintiffs initiated additional complaints. Miller contacted the manager of another Denny's restaurant, Justin Hathaway, who referred her to Ron Randall, the District Franchise Manager for Denny's, Inc. Randall referred the complaint to Dean Moe, a partner in D.F. Zee's, and took no further action. Mathews spoke to two supervisors and was ultimately referred to Moe.

Moe investigated the complaints and made no determination as to whether sexual harassment occurred. He suspended Templeton until an investigation was complete. Moe then suggested that Templeton accept a transfer to a different restaurant, Templeton refused and resigned his employment. No disciplinary action was taken against the cooks or busboys.

In December 1995, Hancock was interviewed by a Civil Rights Monitor employed to investigate complaints that allegedly violated a Consent Decree concerning race discrimination entered into by Denny's. Hancock disclosed Templeton's sexual harassment to the Monitor. Plaintiffs allege that with the commencement of the Monitor's investigation, the workplace became hostile and polarized. In February 1996, Hancock filed a sexual harassment complaint with the Oregon Bureau of Labor and Industries.

Plaintiffs allege that the workplace continued to be hostile. Busboys and cooks continued to make suggestive gestures and remarks, to engage in touching the servers, and to sing love songs to them. Mathews and other employees complained of the busboys' and cooks' conduct but the conduct continued.

Mathews and Hancock allege that they then began experiencing retaliation in the workplace. Cooks would slam their plates of food, hold up their orders and treat them in a hostile manner. Managers gave them extra sidework, reduced their hours, refused requests for additional hours, yelled and screamed at them, and released other employees to go home when the restaurant was busy leaving plaintiffs overwhelmed. Managers also strictly scrutinized their work performance.

A new manager, William Harp, became concerned with the instructions he was receiving from management and initiated a call to Mathews. Harp advised her that management had instructed all the managers that they could not retaliate but they could make life so miserable that she would quit. Harp advised Mathews that he had been directed to give her extra side work and instructed not to give her additional hours as she requested. After the conversation ended, Mathews called Harp back and taped the conversation.

On March 22, 1996, plaintiffs' counsel wrote to an attorney representing Zee's and advised that Hancock and Mathews were experiencing continuing harassment and retaliation in the workplace. When additional incidents of harassment and retaliation occurred, Hancock left her employment on March 22, 1996.

On February 21, 1997, and March 11, 1997, plaintiffs' counsel wrote letters to attorneys representing Denny's and Zee's advising that the unwelcome sexual conduct was continuing in the workplace despite repeated complaints from Mathews. In 1997, Mathews was ultimately terminated for failing to arrive for a scheduled shift.

■ Sexual harassment is actionable when an employee shows she was subjected to verbal or physical conduct of a sexual nature, the challenged conduct was unwelcome; and, the conduct was sufficiently severe and pervasive to alter the conditions of employment. *Ellison v. Brady*, 924 F.2d 872, 875 (9th Cir.1991).

■ To be entitled to a judgment as a matter of law, defendant must be able to show plaintiffs' reaction to the challenged conduct, as a matter of law, was "idiosyncratic or hypersensitive." *Id.* at 880. While a "mere offensive utterance" is not sufficient to create a hostile environment, sexual conduct "which is abusive, humiliating, or threatening violates Title VII even if it doesn't cause diagnosed psychological injury to the victim." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir.1994), *cert. denied*, 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995).

■ Plaintiffs allege a continuing course of sexual conduct in the workplace by several employees. According to plaintiffs, Templeton, General Manager of the Tualatin Denny's, created the hostile environment, while cooks and busboys contributed to that environment. Among the cooks and busboys engaged in the offensive conduct were cooks Stradley and Feliciano, and the busboys, Jorge, Cesar and Octavio. Also, servers Barbara and Sherry participated in or welcomed the sexual conduct.

Plaintiffs' evidence in support of their claims include the following:(1) in a conversation concerning the tip box, Templeton looked at Miller's pelvic area, informed her that he bet she had "a cute little box" and that he could put something in her "cute little box." Miller understood him to be referring to her genital area. (2) Templeton suggested that he and Miller go into the stock room for an hour together. She understood him to be suggesting they have sex. (3) Templeton peeled a banana in front of Mathews and Miller and asked "how much of this do you think you could take?" Both Miller and Mathews understood him to be talking about sex. (4) Templeton hit Miller on the buttocks with a menu. (5) Templeton engaged in a series of jokes where he assert-ed that Miller "owed him a blow job." (6) Templeton disclosed his sex life to Miller. (7) One of the cooks, Feliciano, sang songs to Miller in Spanish, asked her to go out with him on several occasions, and continued to harass her and say he "wanted her" after she rejected his suggestions. (8) The busboys sang songs to Miller in Spanish, saying that they loved her and thought she was pretty. (9) Stradley, the head cook, made statements to Miller about her breasts, legs, and buttocks. Stradley also made animal sounds around her as if to express an animal desire to have sex with her. (10) Stradley asked Miller for a date, Miller said no and Stradley continued to approach her including kissing her on the back of the neck. (11) When Fortuny interviewed for a job, Templeton told her that Denny's is known for sexual harassment and some of the cooks might give her a hard time just to break her in. (12) Shortly after Mathews started work at Denny's, a customer named Dale and Templeton began referring to Mathews as a "hot tamale." (13) Templeton asked Mathews to date him on several occasions. (14) Templeton asked Mathews several times whether she had broken her "streak," and that he wanted to help her break her "streak." Mathews understood him to be referring to his desire to have sex with her. (15) Templeton touched Mathews in the ribs, tried to massage her shoulders and grabbed cigarettes out of her apron pocket which lay against her abdomen. (16) When Mathews came into the restaurant on a day off wearing a tank top, Templeton commented that the way the top pushed her breasts up, "any man would want to jump her." (17) Templeton would greet Mathews by saying, "Hi beautiful." (18) Templeton presented Mathews with a troll doll to which he had attached a pen top so it would look like the doll had an erect penis. (19) Templeton approached Mathews, said the restaurant was quiet and asked if they could "do it on a table." Mathews understood him to be talking about sex. (20) Templeton told jokes of a sexual nature. (21) Feliciano, the cook, kissed Mathews on the cheek. (22) Stradley, the cook, continually made remarks about Mathews' breasts, legs, and buttocks. Stradley made grunting

sounds and said how much he liked what he saw when she came to the pass through to pick up food. (23) In Mathews's initial employment interview, Templeton inquired about her personal life and upon finding out that she was divorced, asked, "What's the problem, wasn't the sex good?" (24) Templeton stated in front of two customers, "Why do women masturbate with two fingers—because they are my two fingers." (25) Templeton told a story where he claimed to have observed a woman lift up her skirt and place peanut butter on her body so that she could get a dog to lick it off. (26) Templeton put whipped cream on his mouth, and inferred that a waitress got a $10 tip by performing oral sex. (27) Busboys looked Hancock "up and down" in a sexual manner. (28) Busboys made persistent inquiries about whether Hancock had a boyfriend and whether she wanted another. (29) Stradley, the cook, made comments inferring he had a sexual relationship with Hancock away from work. (30) Stradley would make frequent comments concerning Hancock's breasts. (31) Stradley would come up behind Hancock and try to rub her back and shoulders. (32) Finally, when Hancock placed an order for pancakes, Stradley threatened to dump pancake batter down the front of her shirt.

Plaintiffs must also establish that the conduct was severe and pervasive enough to alter the conditions of employment. A sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998).

To establish that the conduct was sufficiently severe or pervasive enough to alter the conditions of employment, it is enough if the hostile conduct pollutes the victim's workplace, making it more difficult to do her job, take pride in her work, and remain in her position. *Steiner,* 25 F.3d at 1463. While a mere "offensive utterance" might not create a hostile environment, conduct which is "humiliating" is more likely to do so. *Id.* To be entitled to summary judgment, defendants must show that plaintiffs'

reaction to the challenged conduct, as a matter of law, was idiosyncratic or hypersensitive. *Ellison v. Brady,* 924 F.2d 872, 880 (9th Cir.1991)(evidence that male employee asked plaintiff out for lunch twice and wrote two notes seeking to initiate a relationship was sufficiently severe and pervasive to create an issue of fact as to the existence of an abusive environment).

Plaintiffs have offered sufficient evidence to support their *prima facie* case. Aside from more than thirty incidents of sexual jokes, unwanted touching, unwanted kissing, requests for dates, and requests for sex, plaintiffs have offered evidence that when complaints were made, the environment became retaliatory.

Regarding plaintiffs' claims of retaliation, defendants argue that plaintiffs have no proof of an adverse action. Retaliation is actionable when an employee shows she engaged in conduct protected under Title VII and that the employer subjected her to an adverse employment action because of her protected conduct. *Lam v. University of Hawaii,* 40 F.3d 1551, 1565 (9th Cir.1994). An adverse employment action is "some action in response to her exercise of Title VII rights." *Bouman v. Block,* 940 F.2d 1211, 1229 (9th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991). Plaintiff need not show she was fired, demoted, or suffered some financial loss to state a claim for retaliation. *Id.* Evidence of different treatment is sufficient to support a finding that retaliation caused an adverse action. *Id.*

Plaintiffs rely on evidence of four adverse actions. First, plaintiffs offer evidence that they were subject to constructive discharge. A discharge is an adverse action under the law. Second, following their complaints of sexual harassment, plaintiffs were subjected to a hostile workplace. Third, plaintiffs have offered evidence that managers made an affirmative decision to change the way plaintiffs were supervised. Plaintiffs' evidence that managers were instructed that they could make life so miserable for plaintiffs that they would quit is sufficient to show a change in disciplinary practices. Finally, there is evidence that plaintiffs' hours

were cut, or additional hours were denied, causing them to suffer economic loss. An employer's conduct in selectively enforcing employment policies in retaliation for protected conduct is an adverse action. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 797 (9th Cir.1982).

Plaintiffs offer the following evidence of an intent to retaliate: (1) Admissions by Wilson, assistant manager, that he was seeking to terminate Hancock. Chumley Dep., p. 105–06, 111, 117.(2) Evidence that Ray Chumley, a partner in Zee's, directed managers that they could make life so miserable for plaintiffs that they would quit. Brischetto Aff., Ex. 2, p. 2.(3) Evidence that a manager's notes of this instruction were removed from the workplace and potentially destroyed. Wilson Dep., p. 97.(4) Finally, the manager's log indicates that Bill Harp informed management he had been instructed to tear out pages of the manager's log. Wilson Dep., p. 99. At the time of this instruction, plaintiffs allege the managers were giving them additional sidework, yelling and screaming at them, reducing their hours, and being forced to stay at work when others were sent home even though the restaurant was busy.

Defendants argue that plaintiffs suffered reduced work hours because each had injuries which caused them to be away from work. However, Mathews was told that managers had been instructed not to give her additional hours. Brischetto Aff., Ex. 8, p. 12. There is evidence from the plaintiffs that they were being denied hours, they were being told no hours were available, and less senior servers were getting additional hours. Brischetto Aff., Ex. 10, p. 10. Further, there are deposition admissions that less senior servers were being given shifts over Mathews. Chumley Dep., p. 156. Finally, the proximity in time between plaintiffs' initiation of their complaints and the course of conduct is sufficient to infer a retaliatory intent. *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 731 (9th Cir.1986).

B. *Within Course and Scope of Employment*

■ Zee's also argues that it is not vicariously liable for the actions of its employees which did not occur within the course and scope of their employment.

In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Court articulated rules for holding employers liable when supervisors engage in sexual harassment: (1) an employer is vicariously liable for sexual harassment committed by a supervisor if the conduct was in the scope of employment; (2) when a supervisor's sexual harassment is outside the scope of employment, an employer can be liable where its own negligence is the cause of the harassment; (3) when sexual harassment is outside the scope of employment an employer is vicariously liable when a supervisor takes tangible employment action against the employee; or (4) an employer is vicariously liable for sexual harassment when the supervisor takes non-tangible employment action unless the employer demonstrates as an affirmative defense to liability or damages that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to otherwise avoid harm. *Id.* at 2266–70.

Defendants have failed to establish, as a matter of law, that Zee's is not vicariously liable for the conduct of its employees. Regarding the conduct occurring during Templeton's tenure, plaintiffs have offered evidence that Templeton was the General Manager of the Tualatin Denny's, the highest ranking management level official regularly on the premises. Templeton concedes he engaged in sexual joking in the workplace, and he admits that the sexual conduct in which he engaged was designed to relieve the stress and tension of the restaurant business. Templeton Dep., 164, line 25. Templeton believed that employees who were more relaxed were more productive. Thus, Templeton believed the sexual atmosphere he created benefitted his employer. Templeton Dep., 165, lines 9–12. Stradley also testified that the sexual conduct was designed to "release tension." Stradley Dep. 32, lines 21–23.

When a management level employee creates a sexualized atmosphere in the workplace as a management technique designed, at least in part, to benefit the employer, the conduct is within the scope of employment. *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1376 (9th Cir.1990), *judgment vacated on other grounds*, 501 U.S. 1201, 111 S.Ct. 2791, 115 L.Ed.2d 965 (1991); and *Whelan v. Albertson's, Inc.*, 129 Or.App. 501, 879 P.2d 888 (1994).

Regarding the conduct that occurred after Templeton left Denny's, plaintiffs present evidence that management gave an explicit instruction that managers could make life so miserable for plaintiffs they would quit. Brischetto Aff., Ex. 2, p. 2. When superiors condone harassment and retaliation, the unlawful conduct is within the scope of employment. *Mains v. II Morrow, Inc.*, 128 Or.App. 625, 633, 877 P.2d 88 (1994). *See also, Burlington*, 118 S.Ct. at 2266 (supervisors' sexual harassment is within scope of employment when conduct furthers employer policy to discourage women from seeking advancement).

Plaintiffs also rely on evidence that Templeton and Zee's took tangible employment actions against the plaintiffs which caused them to lose money. Mathews alleges that Templeton reduced her work schedule from five days a week to four days a week in retaliation for rejecting his sexual advances. Brischetto Aff., Ex. 7, p. 3. Mathews and Hancock both allege that management level employees of Zee's reduced their hours, denied them additional hours, or both, in relation for complaining about Templeton's sexual harassment. Brischetto Aff., Ex. 8, p. 12; Ex. 10, p. 10. *Burlington* notes that "[a] tangible employment action in most cases inflicts direct economic harm." *Id.* at 2269. Therefore, there is at least a genuine issue of material fact that because Templeton and Zee's took tangible employment actions that caused plaintiffs economic harm, the company is vicariously liable for any harassment.

Plaintiffs argue further that Zee's is liable for the harassment because it was negligent in preventing or correcting the harassment. Plaintiffs rely on the following evidence: (1) At the time the harassment occurred, Zee's had no written policy prohibiting sexual harassment and no complaint procedure. Moe Dep., p. 15.(2) Assistant manager Wilson knew of the sexual conduct, believed it was inappropriate, yet took no action because "You don't rock the boat. If you rock the boat, then you're in trouble." Wilson Dep., p. 13–15, 18.(3) Miller and Mathews complained to three managers: Templeton, Lehnhart, and Wilson before they ever spoke to Zee's partner, Dean Moe or District Franchise Manager, Ron Randall. Brischetto Aff., Ex. 5, p. 8, Ex. 8, p. 7–8.(4) Wilson heard about the confrontation between Miller's boyfriend and Stradley, however, Wilson viewed it as a "personal problem." Wilson Dep., p. 60.(5) Wilson indicated that Denny's employee sensitivity and diversity trainings were not being done. Wilson Dep., p. 69.(6) Wilson had not been trained about sexual harassment and had no instructions on how to handle it. Wilson Dep. P. 73, 94.(7) Stradley had no training relating to sexual harassment, did not have a basic understanding of what it entailed, and was not provided with his employer's policy on this subject until after the lawsuit arose. Stradley Dep., p. 11.(8) Finally, in March 1996, Ray Chumley gave managers an instruction that they could not retaliate against plaintiffs but they could make life so miserable that plaintiffs would quit. Subsequently, plaintiffs allege, they were subjected to retaliation in the workplace. Brischetto Aff., Ex. 2, p. 2.

Defendants' summary judgment motion on its affirmative defense fails. There is evidence that defendants had no written policy against sexual harassment, there were no complaint procedures in place, when defendants knew of sexual harassment they took no action, sexual harassment was continuing in the workplace despite complaints, and management level employees gave instructions to "make life so miserable" for those complaining of sexual harassment that they would quit.

### C. *Constructive Discharge Claims*

#### (1) FEDERAL CLAIM

Defendants also move for summary judgment on plaintiffs' constructive dis-

charge claims. Under federal law, a constructive discharge occurs when, looking at the totality of the circumstances, "a reasonable person in [the employee's] position would have felt forced to quit because of intolerable and discriminatory working conditions." *Satterwhite v. Smith,* 744 F.2d 1380, 1381 (9th Cir.1984). Plaintiff need not show that the employer subjectively intended to force the employee to resign. *Watson v. Nationwide Ins. Company,* 823 F.2d 360, 361 (9th Cir.1987).

The determination of whether conditions are so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question. *Nolan v. Cleland,* 686 F.2d 806, 814 n. 14 (9th Cir.1982). A single isolated instance of employment discrimination, such as unequal pay for equal work, is insufficient, as a matter of law, to support a finding of constructive discharge. Rather, there must be an "aggravating factor." *Nolan,* 686 F.2d at 813. In *Nolan,* the court held that evidence of four instances of discrimination over a two year period was sufficient to create an issue of fact defeating summary judgment. *Id.*

Miller and Hancock allege a series of unwelcome sexual jokes, sexual conduct and remarks. Hancock alleges retaliatory conduct including assigning her extra side work, denying her additional hours of work, and yelling and screaming at her in an abusive manner. On her last day of work she experienced repeated comments from busboys who called her "baby," told her they loved her, and made other comments. Hancock decided she could no longer endure the workplace and did not return to work. Plaintiffs rely further on the following to evidence a pattern of discriminatory and retaliatory conduct: (1) Following complaints of sexual harassment, there was a great deal of hostility in the workplace. Chumley Dep., p. 64.(2) Everyone was talking about the complaints and was angry with Mathews. *Id.* (3) Following the complaints of sexual harassment, Chumley, a partner in Zee's, gave an instruction that managers could make life so miserable that the plaintiffs would quit. Brischetto Aff., Ex. 2, p. 2.(4) Chumley encouraged Hancock to quit. Brischetto Aff., Ex. 10, p.

10.(5) Wilson, a assistant manager, wrote in the manager's log of his desire to terminate Hancock, and that if certain behavior occurred, he would terminate her on the spot. (6) Chumley admits that Wilson had a difficult time controlling his frustration. Chumley Dep., p. 105.(7) Finally, after sexual harassment complaints were filed, management permitted sexual harassment to occur in the workplace for at least a year and a half. Brischetto Aff., Ex. 15, p. 1–2.

Plaintiff's circumstantial evidence of a pattern of sexual harassment directed at three different women, joined with direct evidence that management engaged in retaliation towards those who complained of sexual harassment, is sufficient to create an issue of fact as to plaintiffs' claims of constructive discharge.

### (2) STATE CLAIM

To state a claim for constructive discharge under state law, a plaintiff must plead and prove (1) the employer intentionally created or intentionally maintained specified working conditions; (2) these conditions were so intolerable that a reasonable person in the employee's position would have resigned because of the conditions; (3) the employer desired to cause the employee to quit, or was substantially certain that the employee would leave as a result of those working conditions; and (4) the employee did leave because of those working conditions. *McGanty v. Staudenraus,* 321 Or. 532, 557, 901 P.2d 841 (1995).

Miller presents evidence that she complained to Templeton, Lehnhart and Wilson to no avail as Templeton and other employees continued the harassment. Brischetto Aff., Ex. 5, p. 7, 10. This evidence is sufficient to create an issue of fact as to whether Templeton was deliberately maintaining working conditions that would either force Miller to submit to the harassment or quit her job.

Regarding Hancock, plaintiffs offer evidence that management gave a directive that supervisors could make life so miserable that plaintiff would quit. Brischetto Aff., Ex. 2, p. 2. Following her complaint, Hancock alleges

that she was subjected to different treatment from other employees, screaming and yelling, and a pattern of retaliation. Brischetto Aff., Ex. 10, p. 10–11.

Plaintiffs' claim for constructive discharge under both state and federal law survives defendants' motion for summary judgment.

### D. Intentional Infliction of Emotional Distress (IIED)

■ A claim for IIED requires proof that: (1) defendants intended to inflict severe emotional distress; (2) defendants' conduct did, in fact, cause plaintiffs to suffer severe emotional distress; and (3) defendants' conduct involved an extraordinary transgression of the bounds of socially tolerable behavior. *McGanty*, 321 Or. at 543, 901 P.2d 841.

■ There exists a genuine issue of material fact as to the viability of this claim. Regarding the first element, in *Franklin v. Portland Community College*, 100 Or.App. 465, 470, 787 P.2d 489 (1990), the court held that allegations of a continuing pattern of discrimination and retaliation against the plaintiff with an intent to demean and insult the plaintiff, if proven "are enough to establish ... the specific intent to cause plaintiff emotional distress." Plaintiffs have alleged a specific course of conduct of sexual harassment and retaliation extending over several months. Pursuant to *Franklin*, when a plaintiff offers proof that supervisors harass and retaliate against the plaintiff after complaints are filed, this evidence is sufficient to infer an intent to cause emotional distress.

The next element is whether defendants' conduct did, in fact, cause plaintiffs to suffer severe emotional distress. I find that each plaintiff has offered sufficient evidence to withstand a summary judgment motion. Mathews alleges that she experienced vomiting before work and at work, difficulty sleeping, nightmares, loss of appetite, lost weight and irritability with her children. When her hours were cut she was evicted from her home because she could not pay her rent. She lived in hotels, and in her car on the street and ultimately moved in with her sister. She alleges that she suffered depression and social withdrawal. Brischetto Aff., Ex. 8, p. 13.

Miller alleges that she felt embarrassed, belittled, threatened, humiliated, and demoralized. The cumulative effects of the harassment caused her to feel anxious. She sought out medical treatment for those feelings. She would become quiet, withdraw, and had difficulty talking about her experiences. She could not sleep, felt depressed, was afraid to go to work and afraid to work in environments with male employees. She experienced anxiety attacks which consisted of difficulty breathing, heart racing, and feeling that she was going to die. She experienced nightmares related to people and incidents of harassment. Brischetto Aff., Ex. 5, p. 12–13.

Finally, Hancock alleges that she cried at work and at home, had difficulty sleeping, and lost weight. She vomited at work, outside of work, and at home. She suffered stress, anxiety, and embarrassment as a result of the financial problems caused by the defendants' conduct. She had to apply for public assistance which was stressful and embarrassing. Brischetto Aff., Ex. 10, p. 12.

Plaintiffs' evidence of severe emotional distress is sufficient to create an issue of fact for resolution by the jury. *See Bodewig v. K–Mart, Inc.*, 54 Or.App. 480, 635 P.2d 657 (1981), *rev. denied*, 292 Or. 450, 644 P.2d 1128 (1982); and *Rockhill v. Pollard*, 259 Or. 54, 63, 485 P.2d 28 (1971)(that plaintiff became nervous, had to take tranquilizers, and experienced loss of appetite and sleeplessness was sufficient to state a *prima facie* case of severe emotional distress for resolution by jury).

### 2. DENNY'S MOTION FOR SUMMARY JUDGMENT

#### A. Franchisee/Franchisor

Denny's moves for summary judgment arguing that franchisors cannot be liable for harassment or discrimination alleged by franchise employees. I disagree and find that at least a question of material fact exists as to this issue.

■ The "single employer" test is used to determine if two business entities are a single employer. This court has previously

stated that the single employer test is relevant when "separate corporations are not what they appear to be, that in truth they are but divisions or departments of single enterprise." *U.S. Football League Players Assoc., AFL–CIO v. U.S. Football League,* 650 F.Supp. 12, 15 (D.Or.1986)(quoting *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960)). Under this test, four factors are considered in determining whether two entitles are, in fact, one: integration of operations, common management, centralized control of labor relations, and common ownership. *Id.*

The "joint employer" test does not involve a single integrated enterprise, rather, it assumes that the employers are what they appear to be—separate legal entities that have merely "chosen to co-determine important matters governing the employer-employee relationship." *USFL Players Assoc.,* 650 F.Supp. at 15. There is also the "agency" theory for determining when two employers are jointly liable under Title VII, under which the determination of whether one entity is an agent for another is determined based upon traditional rules of agency.

The Ninth Circuit has adopted each of these tests for use in appropriate cases. *See NLRB v. Don Burgess Construction Corp.,* 596 F.2d 378, 384 (9th Cir.), *cert. denied,* 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979)(single employee test); *Sun–Maid Growers of California v. NLRB,* 618 F.2d 56, 59 (9th Cir.1980)(joint employer test); and *Kaplan v. International Alliance of Theatrical and Stage Employees of the United States and Canada,* 525 F.2d 1354, 1360 (9th Cir.1975)(agency theory).

This court recently held that, under federal law, a franchisor may be held vicariously liable under an agency theory for intentional acts of discrimination by employees of a franchisee. *Malone v. McDonald's Corp.,* Civ. No. 95–41–JO (March 19, 1996).

Here, Denny's is responsible for acts of harassment by employees at the Tualatin Denny's because employees of the Tualatin Denny's are agents of the Denny's defendants (Denny's, Inc. and Flagstar Corporation).

Under Oregon law, an agency results from the manifestation of consent by one person to another so that the other will act on his or her behalf and "subject" to his or her control, and consent by the other to so act. *Larrison v. Moving Floors, Inc.,* 127 Or.App. 720, 723, 873 P.2d 1092 (1994). An agency relationship may be evidenced by an express agreement between the parties, or it may be implied from the circumstances and conduct of the parties. The principal's consent and "right to control" are the essential elements of an agency relationship. *Cain v. Rijken,* 300 Or. 706, 717 P.2d 140 (1986). It does not matter whether the putative principal actually exercises control; what is important is that it has the right to do so. *Miller v. McDonald's Corp.,* 150 Or.App. 274, 279 n. 3, 281, 945 P.2d 1107 (1997)(franchisor may be vicariously liable for the conduct of a franchisee as an agent depending upon the extent of control the franchisor exercises over the franchisee). Further, unless the evidence allows but one inference, the question of agency is one of fact for the jury. *Themins v. Emanuel Lutheran Charity Board,* 54 Or.App. 901, 908, 637 P.2d 155 (1981), *rev. denied,* 292 Or. 568, 644 P.2d 1129 (1982).

In *Miller,* the court found that agreements which require compliance with detailed manuals can "be read as retaining the right to exercise control over the franchisee's operations." *Miller,* 150 Or.App. at 281, 945 P.2d 1107. Specifically, the court found that the McDonald's agreement:

> did not simply set standards that [the franchisee] had to meet. Rather, it required [the franchisee] to use the precise methods the defendant established, both in the agreement and in the detailed manuals that the agreement incorporated. Those methods included the ways in which [the franchisee] was to handle and prepare food. Defendant enforced the use of those methods by regularly sending inspectors by and it retained power to cancel the agreement.

*Id.*

Here, as in *Miller,* the franchise agreement requires adherence to comprehensive,

detailed manuals for the operation of the restaurant. The Franchise Agreement between Denny's and Zee's provides, in part:

Franchisee acknowledged and agrees that strict and continued adherence by the franchisee to the company's standards, policies, procedures and requirements, as set forth in this Section 11.0, is expressly made a condition of this agreement, so that failure on the part of franchisee to so perform will be grounds for termination of this agreement . . . . The company has prepared an operations manual and a food service standards manual. Franchisee understands that the company has entered into this agreement in reliance upon franchisee's representation that it will strictly comply with all provisions of the manuals. Brischetto Aff., Ex. 3, p. 10.

Here, as in *Miller*, defendants enforce the use of these methods by regularly sending inspectors into the restaurant to assess compliance, Brischetto Aff., Ex. 5, p. 13, and by its retained power to cancel the agreement. *Id.* at p. 10.

Further, the Franchise Operations Manual provides that the defendants had the right to control their franchisees in the precise parts of the franchisee's business that allegedly resulted in plaintiffs' injuries—training and discipline of employees. Under the Agreement, the franchisee agrees to "hire, train and supervise restaurant employees in accordance with the applicable provisions of the operations manual." Brischetto Aff., Ex. 5, p. 12. The Franchise Agreement specifically authorizes the franchisor to terminate the agreement in the event that Franchisee employees do not comply with the Operations Manual.

Further, the agreement requires that the franchisee submit its own managers to training from the company and that all managers subsequently employed submit to such training as the company requires. Brischetto Aff., Ex. 5, p. 12. Denny's undertakes to train franchise employees in diversity and non-discrimination. Further, Denny's Franchise Operations Manual involves the Denny's defendants directly in complaints, investigation, and discipline of franchise employees for discrimination.

Denny's Franchise Operations Manual reserves the right to decide the amount of discipline assessed against franchise employees, decides the level of discipline that should be administered, and sets mandatory levels of discipline.

Similarly, defendant Flagstar conducted the internal audits of the franchise operations. Under the Franchise Operations Manual, Flagstar's internal auditors were responsible for: (1) determining whether the Denny's franchise policies and operating procedures were being complied with; (2) determining whether provisions of the Franchise Agreement were being compiled with; and (3) identifying opportunities where operating effectiveness and efficiencies could be enhanced. Brischetto Aff., Ex. 13, p. 1–65.

The Franchise District Manager (employed by Denny's, Inc.) reported directly to a Flagstar official who had responsibility for all Denny's corporate stores. Randall Dep., p. 45–46. The Franchise District Manager of Denny's, Inc. admits that his employer was Flagstar, Inc. and his paychecks were written by Flagstar, Inc. *Id.*, p. 144–45.

Defendants argue that the Franchise Agreement specifically provides that employees of franchisee's are not to be considered employees of Denny's. Similarly, the franchise agreement in *Miller* provided that the franchisee "was not an agent of defendant for any purpose. Rather, it was an independent contractor[ .]" *Miller*, 150 Or.App. at 278, 945 P.2d 1107. Nevertheless, the court found this disclaimer was not controlling. Here, as in *Miller*, plaintiffs' evidence that defendants reserved the right to train and discipline franchise employees is significant.

■ However, even if this court determined that plaintiffs' evidence of "actual authority" was insufficient to create an issue of fact, I find there is sufficient evidence to create a material issue of fact that employees of franchisees had apparent authority to act on behalf of Denny's, Inc. and Flagstar Corporation. *See Malone v. McDonald's, supra.* In *Malone*, the court relied on evidence that there was no indication that the restaurant was owned or managed by a franchisee, the McDonald's logo was highly visible through-

out the restaurant, including on employee's uniforms, at the restaurant entrance, and on food packaging and products in the store. The court also found it significant that the franchise agreement required the franchisee to spend a portion of its gross receipts on advertising that contained the McDonald's trademark. *Malone*, Civ. No. 95–41–JO, at p. 6.

Here, as in *Malone*, there was no indication in the restaurant that the restaurant was owned by a franchisee. Prior to April 1996, there were no signs in the Tualatin Denny's indicating who the owners were. Moe Dep., p. 53. The Denny's trademark was prominently displayed throughout the restaurant on the servers' uniforms, signs at the entrance of the restaurant, and on menus. Brischetto Aff., Ex. 3, p. 3–4. None of the plaintiffs realized that the restaurant was owned by Zee's. Each of the plaintiffs believed they were "Denny's" employees. *Id.* at 4. Servers were told they were Denny's employees. Brischetto Aff., Ex. 4, p. 1–2; Ex. 5, p. 1; and Ex. 10, p. 2.

Further, here, again as in *Malone*, the franchisee pays a 4% royalty fee for use of the Denny's trademark, and the availability of company supplied supervisory training and other professional personnel. The franchisee also pays a 2% royalty fee for institutional advertising, public relations, and promotion of the Denny's product. Brischetto Aff., Ex. 5, p. 8. The franchisee is prohibited from engaging in its own institutional advertising activities. *Id.* at 8.

Plaintiffs' evidence creates a question of fact as to whether franchise employees acted with at least the apparent authority of the Denny's defendants.

Plaintiffs also have claims of direct liability against Denny's for negligent training and negligent enforcement of the Franchise Operations Manual policies. Plaintiffs rely on evidence that Denny's undertook to train the staff at the Tualatin Denny's in diversity and non-discrimination and failed to sufficiently train the Tualatin staff in sexual harassment. Plaintiffs also rely on evidence that Denny's failed to train managers in how to deal with sexual harassment, failed to circulate any policy against sexual harassment, and failed

to train employees in what constitutes sexual harassment. Wilson Dep., p. 18, 73, 84; Stradley Dep., p. 11–12.

### B. *Plaintiffs' State Law Claims Against Denny's*

In Oregon, a principal is vicariously liable for acts of wrongful discharge by its agents. *Mains*, 128 Or.App. at 629, 877 P.2d 88. A principal can be vicariously liable for acts of intentional infliction of emotional distress committed within the scope of employment. *Dias*, 919 F.2d at 1375. For conduct to be in the scope of employment, it must occur substantially within the time and space limitations of employment, it must be motivated, at least in part, by a purpose to serve the employer, and the act must be of a kind which the employee was hired to perform. *Chesterman v. Barmon*, 305 Or. 439, 753 P.2d 404 (1988).

There is evidence here that the conduct complained of was within the scope of employment. There is no dispute that all of the conduct in question occurred within the time and space limits of the workplace. With respect to the conduct that occurred while Templeton was general manager, he has admitted in his deposition that he viewed the sexual conduct and comments to be a management tool for relieving employee stress in the workplace. Templeton Dep., p. 164–65. With respect to the course of conduct that occurred after Templeton left, there is evidence that management gave an explicit instruction to the managers that they could make life so miserable for the plaintiffs that they would quit. Brischetto Aff., Ex. 2, p. 2.

### C. *Jurisdictional Requirements Under Title VII*

Defendant Flagstar Corporation argues that plaintiff failed to satisfy jurisdictional requirements in Title VII by failing to name Flagstar in an administrative complaint. The exhaustion of administrative remedies requirement under Title VII is not a jurisdictional requirement, rather it is a condition precedent to suit, which a defendant may waive or be estopped from asserting. *Stache v. International Union of Brick-*

*layers,* 852 F.2d 1231, 1233 (9th Cir.1988), *cert. denied,* 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 32 (1989).

 Each plaintiff filed Oregon Bureau of Labor and Industry complaints against Denny's, Inc. and D.F. Zee's, Inc. Brischetto Aff., Ex. 7,9, 17, 26. Each plaintiff alleged the same acts of harassment and retaliation in her complaint as those that are the subject of this lawsuit. When Flagstar Corporation was joined as a defendant, no new allegations were raised. Flagstar Corporation was sued under a theory of vicarious liability for the acts of its agents; and negligence for its agent, Mr. Randall's, failure to enforce the Franchise Operations Manual.

Since plaintiffs' claims are claims of imputed liability, a charge notifying D.F. Zee's and Denny's, Inc. is sufficient to satisfy any exhaustion requirement for Flagstar Corporation. *See Kaplan,* 525 F.2d at 1359 (international union received no notice of complaint filed against local union, where unions were joint signatories to referral agreement that allegedly perpetuated effects of past discrimination, "it is sufficient that the EEOC be apprised, in general terms, of the alleged discriminating parties and the alleged discriminatory acts").

### CONCLUSION

Defendants Denny's (doc. 123, 137) and Zee's (doc. 130, 143) ·motions for summary judgment and amended motions for summary judgment are denied.

IT IS SO ORDERED.