**Mickey NOVAK Plaintiff—Appellant,**

v.

**SEIKO CORPORATION; Seiko Instruments Corporation, a Japanese corporation; Seiko Epson Corp., a Japanese corporation; Time Tech, Inc., a Japanese corporation Defendants—Appellees.**

No. 01–35002.

D.C. No. CV 99–1022–MA.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 2002.

Decided May 16, 2002.

Before B. FLETCHER, O'SCANNLAIN, and BERZON, Circuit Judges.

## ORDER

The panel hereby withdraws the memorandum disposition filed on April 17, 2002. It files a new memorandum disposition contemporaneous with this order.

The petition for rehearing is denied. No further petition will be entertained.

## MEMORANDUM *

Mickey Novak appeals the district court's order granting summary judgment to defendants Seiko Corporation (SC), Seiko Instruments, Inc. (SII), Seiko Epson Corporation (SE), and Time Tech, Inc. (TT). Novak claims he is entitled to compensation for introducing the Seiko family of companies to Nike Corporation. Novak bases his claims on theories of implied contract, fraud, and misrepresentation. The district court granted summary judgment in favor of the Seiko companies. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

Because the parties are familiar with the facts of this case, we repeat them here only as necessary.

We review a grant of summary judgment de novo. *See Delta Svgs. Bank v. United States,* 265 F.3d 1017, 1021 (9th Cir.2001). We must determine, viewing the evidence in the light most favorable to the nonmoving party (Novak), whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* When a mixed question of fact and law involves undisputed underlying facts, summary judgment may be appropriate. *See Colacurcio v. City of Kent,* 163 F.3d 545, 549 (9th Cir.1998).

## I. Agency

Novak's claim rests in large part on his contention that SC, SII, SE, and TT function as a single entity and that TT, which is owned by the other three companies, is essentially their agent. In his view, if the companies operate as a seamless whole, the fact that two participants in the "Seiko Group" obtained business from Nike means that he—as the first person who can document having made a phone call in which the Nike sports watch project was discussed—should be compensated.

In fact, SC, SE, SII, and TT are independent entities and have separate legal identities in accordance with Japanese law. SC, TT's eighty percent owner, does not direct the operations of TT. Officers for each of the corporations operate independently, and each corporation maintains a separate board of directors. All relevant operations are separate.

As the district court found, nothing in the record suggests that Novak had any authority—implicit or otherwise—to act as

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36–3.

an agent of any company except, perhaps, TT. Assuming Novak was authorized to act as TT's agent, unless TT was acting as the agent of the other three companies with their express or apparent authority, those companies may not be held liable for any damages Novak may have suffered at TT's hands.

Novak offers no evidence that SC, SII, or SE gave TT express authority to negotiate with Nike on their behalf. In fact, he produces no evidence to show that SC, SII, or SE control TT in any way. Although it is true that TT sells products manufactured by SII and SE, Novak does not demonstrate how those relationships are any different than traditional supplier-purchaser relationships.

Novak seems to suggest that TT had apparent authority—as, therefore, did he, if he was TT's agent—to negotiate with Nike on behalf of the other companies. Apparent authority is created " 'only by some conduct of the principal which, when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter. The third party must also rely on that belief.' " *Badger v. Paulson Inv. Co., Inc.*, 311 Or. 14, 803 P.2d 1178, 1183 (Or.1991) (*quoting Mattson v. Commercial Credit Bus. Loans*, 301 Or. 407, 723 P.2d 996 (Or.1986) (en banc)).

Novak misinterprets *Miller v. D.F. Zee's, Inc.*, 31 F.Supp.2d 792 (D.Or.1998). In *Miller*, the court determined that because Denny's as franchisor retained power in employment-related areas of its franchisees' operations, there was a triable issue of fact as to whether franchise

employees acted as the franchisor's agents. *Id.* at 807. The court found the existence of the Denny's trademark throughout the franchisee premises and the inability of plaintiffs to know that the restaurant was owned by a franchisee rather than Denny's, the franchisor, as factors giving rise to a triable issue with respect to the existence of apparent authority.

The instant case is entirely different. Novak has produced no evidence that, due to some aspect of his relationship with TT, he reasonably believed himself entitled to act on behalf of SC, SII, or SE in negotiations with Nike. As a director of TT, Novak was aware that the companies' boards operated separately. As a former contractor for SC, he was also aware that they undertook contracts separately. Furthermore, Novak admits that he spoke only with Komatsu and Manabe—both TT executives—about the sports watch project.[1] Novak points to nothing in the record to support his having had a reasonable belief that Komatsu and Manabe, by encouraging him to prepare a proposal for TT, were somehow imbuing him with the power to be the face of all Seiko affiliates in any future Nike discussions. In fact, once he knew that Kartsotis was involved, Novak must have known the opposite was true.

Novak also argues that SC, SII, and SE somehow ratified his actions as their representative and were thus unjustly enriched when they failed to give him a cut of their proceeds. Ratification requires a specific intent to ratify a particular transaction. *Robertson v. Jessup*, 96 Or.App.

---

1. Novak contends in his brief that he met with *"Sekimoto of SC."* Appellant's Brief at 19 (emphasis in original). His citation does not bear this out. First, the citation is to a fax from Komatsu to Sekimoto, who at the time was president of TT, not SC. Second, the fax describes Komatsu's discussion with Novak, and in no way indicates that Novak ever met with Sekimoto or, for that matter, with anyone except Komatsu and Manabe, both of whom were TT executives.

349, 773 P.2d 385, 387 (1989). Novak claims the non-TT defendants ratified Novak's May 11, 1995 meeting with Nike and his subsequent communication of information to Komatsu, who in turn forwarded it to the Planning Development Group.

■ In fact, SII through Hattori and FOSSIL's Kartsotis had been developing ties and information completely independently of Novak. Hattori was not even aware of Novak or of TT's contact with Nike. Novak offers no facts to suggest that SC, SII, and SE had the specific intent to ratify any transaction. There is simply no evidence in the record to suggest that SC, SII, or SE authorized TT or Novak to act on their behalf in any capacity, or that they in any way ratified any actions Novak undertook on TT's behalf that ultimately benefitted them.

II. Implied–in–Fact Contract

Novak alleges breach of an implied-in-fact contract by the "Seiko Group." He imputes TT's knowledge that he expected payment if a Nike deal was made with SII and SC. As explained above, there is no evidence that either TT or Novak acted as agents of the defendants, or even that the defendants were aware of Novak's minimal services and his payment expectations.

An implied-in-fact contract has the same legal effect as an express contract. *See Staley v. Taylor*, 165 Or.App. 256, 994 P.2d 1220, 1224 (2000) (*citing Restatement (Second) of Contracts* § 4 cmt. a (1979)). "The only difference between them is the means by which the parties manifest their agreement. In an express contract, the parties manifest their agreement by their words, whether written or spoken. *Id.* In an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct." *Id.*

■ Contrary to what Novak suggests, an implied contract must still have discernable terms. "An implied contract can arise only where the natural and just interpretation of the parties warrants such a conclusion." *Owen v. Bradley*, 231 Or. 94, 371 P.2d 966, 970 (1962). For such a situation to exist, the parties must exhibit "mutual expressions of assent." *Jaqua v. Nike, Inc.* 125 Or.App. 294, 865 P.2d 442, 445 (1993).

Here, the facts reveal that TT, through Komatsu, intended to pay Novak a fair finders fee if the company secured a deal with Nike. However, despite several requests, Novak never made a formal proposal about what he would consider reasonable compensation. When he floated his 3 percent notion, Komatsu told him he thought he could only pay a lump sum in recognition of Novak's introduction to Nike. Novak never came back to Komatsu—despite Komatsu's requests—to suggest a fair figure. The record reveals internal TT communications wherein executives considered figures including $3,000 and $5,000, but there is no evidence that any numbers were ever shared with Novak.

■ Oregon subscribes to the objective theory of contract. In determining whether a contract exists and what its terms are, we examine the objective manifestations of intent, as evidenced by the parties' communications and acts. *Real Estate Loan Fund Oreg. Ltd. v. Hevner*, 76 Or.App. 349, 709 P.2d 727, 730 (1985). "The law of contracts is not concerned with the parties' undisclosed intents and ideas. It gives heed only to their communications and overt acts." *Kitzke v. Turnidge*, 209 Or. 563, 307 P.2d 522, 527 (1957). Here, the parties objective manifestations reveal no mutual assent with respect to how much compensation Novak could expect for introducing TT to Nike.

Furthermore, it appears that any compensation would have been based on TT actually having gotten business from Nike, which it did not. Therefore, if Novak was to recover from the sports watch revenues, his implied contract would have to be with SII or SC. Because Novak never had any conversations or other communications with anyone outside of TT, there is no mutual assent to any possible contract terms with either SII or SC. The only way Novak could recover from SII or SC would be if TT were acting as its agent, which, as discussed above, it was not. Even if it were, the uncertainty of essential terms negates Novak's contention that a contract was implicitly formed. He raises no triable issues of material fact that suggest otherwise. Thus summary judgment on this claim was appropriate.

III. Implied–in–Law Contract (Quasi–Contract)

Quasi-contract—or implied-in-law contract—is a remedial device to "accomplish[ ] substantial justice by preventing unjust enrichment." *Derenco v. Benj. Franklin Fed. Sav. & Loan,* 281 Or. 533, 577 P.2d 477, 492 (1978). To establish a quasi-contract, the plaintiff must prove all three of the following: that (1) a benefit was conferred, (2) the recipient was aware that a benefit was received and; (3) under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it. *See Jaqua,* 865 P.2d at 445 (*citing* 3 Arthur L. Corbin on Contracts § 561 (1963 & Supp. 1992)). "Injustice," the third prong, requires that one of the following be shown:

(1) the plaintiff had a reasonable expectation of payment;

(2) the defendant should reasonably have expected to pay; or

(3) society's reasonable expectations of security of person and property would be defeated by non-payment.

*Id.* (*citing* 1 Arthur L. Corbin on Contracts § 19A (Supp.1992)).

■ As to the benefit conferred, the only point in Novak's favor is that, of all the people involved, he spoke to Nike first. However, he did not have a truly substantive conversation with Nike until May, 1995—after FOSSIL's Kartsotis had met with Nike and laid the groundwork for the introduction of SII's Hattori to Nike in June. Nike's Mooney points to the Kartsotis/Hattori meeting as the one that set things in motion and ultimately led to Nike's deal with SII and SC. Not only was Novak's visit apparently not memorable to Nike, he was not even representing one of the companies that ultimately obtained Nike's business.

However, Novak claims he conferred a benefit on the "Seiko Group" when he passed along information to Komatsu, who in turn passed it along to the Product Development Group, which included individuals from SC and SII. Because Hattori's visit to Nike was so significant, and because it arose out of Kartsotis' contact alone, it is unlikely that Novak's information—which basically amounted to notification that Nike was considering marketing sports watches, sunglass frames, and other items—conferred any benefit on SII and SC.

Turning to the second prong, awareness by the recipient that it had received a benefit, since the Product Development Group (PDG) expressed interest in pursuing the Nike opportunity after hearing Novak's information from Komatsu, we can possibly find that PDG was the recipient of a benefit and was aware that Novak conferred it.

Even were we to assume that Novak can establish the first two elements, he is un-

able to raise a triable issue of material fact on any of the three ways to meet the third prong—that it would be unjust not to pay him. First, Novak never responded to requests that he propose compensation should TT have established a relationship with Nike. Moreover, he presented no valuable information and played no part in forging the ultimate relationship between Nike and SC and SII. Therefore, Novak could not reasonably expect payment. Second, Novak's information was so minor compared to that arising from the Kartsotis and Hattori contacts and so incidental to forming the relationship between SC and SII that Seiko should not reasonably have expected to pay Novak, particularly when he made no written proposal to any of the Seiko companies or even to TT despite its requests. Third, based on the undisputed facts, no reasonable trier of fact could find that "society's reasonable expectations of security of person and property would be defeated by non-payment" for the tiny bit of information Novak was able to provide based on his very preliminary contacts with Nike.

Novak has failed to raise a triable issue with respect to any defendant's unjust enrichment. Therefore we affirm summary judgment in favor of the appellees on this claim.

## IV. Fraud

In Oregon, a fraud claim has five elements: (1) defendants falsely represented a material fact; (2) defendants' misrepresentation was knowingly made, or made with an insufficient basis for asserting its truth; (3) the misrepresentation was made with the intent to induce plaintiff to act or refrain from acting; (4) plaintiffs justifiably relied on defendants' misrepresentation; and (5) plaintiffs suffered resultant damage. *In re Harris Pine Mills*, 44 F.3d 1431, 1439 (9th Cir.1995) (*citing Riley Hill*

*Gen. Contractor, Inc. v. Tandy Corp.*, 303 Or. 390, 737 P.2d 595, 604 (1987) (en banc) and *Gregory v. Novak*, 121 Or.App. 651, 855 P.2d 1142, 1143 (1993)).

In answers to interrogatories, Novak indicated that the only people from any Seiko affiliates with whom he spoke about the Nike project were Komatsu and Manabe, both of TT. Novak claims that Komatsu and Manabe made the statements upon which he bases his fraud and misrepresentation claims against the Seiko entities. Novak contends that Manabe and Komatsu told him in March and April 1995 that his role would be to sell Nike on the idea of partnering with Seiko. Believing they were telling the truth, Novak acted upon their representations and set up the May 1995 meeting. But later, Novak complains about what he characterized as "a deliberate effort to muscle me and to—to essentially squeeze me out."

Novak identifies two supposed frauds or misrepresentations: first, he was not compensated, and second, he was not kept apprised of the status of the Nike–Seiko deal. Novak claimed that Manabe gave him the sense that there was no deal with Nike. Since SII was, in fact, negotiating a deal with Nike, Novak argues Manabe made a misrepresentation.

Even assuming all facts are true as Novak alleges, his claims necessarily fail on the first, fourth, and fifth elements of fraud. Novak cannot point to any promise of compensation. In fact, the record reveals that Komatsu tried repeatedly to get Novak to specify a fair sum should TT get the deal; Novak never submitted a proposal. Furthermore, Novak can point to no statements representing that no other Seiko entity was moving forward with Nike negotiations. While it seems clear that Novak would have liked to have been in the loop with respect to SII and SC's negotiations, he was not entitled to such

information. Neither Manabe nor Komatsu ever "falsely represented a material fact." Instead, they told him—truthfully—that TT had been severed from the project. Even Komatsu indicated that he was unaware of the depth of the negotiations with SII and SC until some two years later.

Novak also fails to raise any triable issues with respect to reliance or damages. Although he did rely on Komatsu's encouragement to pursue the May meeting with Mooney, at that point Komatsu truly hoped Novak might secure business for TT. Therefore, any statements upon which Novak was relying were not fraudulent. Moreover, Komatsu intended to pay Novak if Novak submitted a reasonable proposal and opened the door for TT. After the May meeting, Novak made no further efforts on TT's behalf, thus he could not have been relying on any comments to his detriment. Finally, he shows no way in which he might have relied on any misrepresentation with respect to Nike's continuing negotiations with SII and SC.

Novak has failed to raise any triable issues of fact with respect to his fraud claim. Here again, we affirm the district court's summary judgment order.

## V. Misrepresentation

■ Novak cannot sustain a negligence claim because he cannot prove a "special relationship" with the defendants. For such a relationship to exist, the party owing the duty of care "is, at least in part acting to further the economic interests of the client, the person owed the duty of care." *A.T. Kearney, Inc. v. IBM Corp.,* 73 F.3d 238, 241–242 (9th Cir.1995) (*citing Onita Pac. Corp. v. Trs. of Bronson,* 315 Or. 149, 843 P.2d 890, 897 (1992) (en banc)). The Oregon Supreme Court has held that duty is a legal issue to be decided by the court. *Fazzolari v. Portland Sch.*

*Dist. No. 1J,* 303 Or. 1, 734 P.2d 1326, 1328 (1987) (en banc).

Novak makes no showing—and on this record could not make a showing—to suggest that SC, SII, or SE owed him a duty of care. None of these defendants had any contact with Novak, thus they can hardly be said to have been acting to further his economic interests.

With respect to TT, although Novak and Komatsu did indicate a plan to negotiate at arms length over Novak's compensation, it does appear that both Novak and TT were pursuing similar interests. They cannot be said to have been "two adversarial parties negotiating at arm's length to further their own economic interest." *A.T. Kearney,* 73 F.3d at 242.

■ Even assuming TT owed Novak a special duty of care, Novak does not present a triable issue of fact on his misrepresentation claim. To prove negligent misrepresentation, Novak must demonstrate losses that were "the foreseeable result of [the] alleged unreasonable misrepresentations." *Allstate Ins. Co. v. Tenant Screening Servs.,* 140 Or.App. 41, 914 P.2d 16, 21 (1995). While the record does reveal a certain behind the scenes fear on the part of Komatsu and Manabe about breaking the news to Novak that TT was no longer part of the Nike deal, as explained in the prior section Novak is able to point to no misrepresentations and no damages suffered as a result. Therefore, the district court properly granted TT—as well as the other defendants—summary judgment on this claim.

AFFIRMED.